JENNIFER ANDRADE, Plaintiff-Appellant and Cross-Appellee, v. GENERAL MOTORS CORPORATION, Defendant-Appellee and Cross-Appellant.

Second District No. 2—01—0480

Opinion filed February 19, 2003.

828

Richard J. Smith, of Sullivan, Smith, Hauser & Noonan, Ltd., of Wauke-
gan, and H. Thomas Davis, of Law Offices of H. Thomas Davis, of Zion, for ap-
pellant.

Frank Nizio, Norma M. Gant, and Terrence E. Haggerty, all of Bowman &
Brooke, L.L.P., of Detroit, Michigan, and Evan A. Burkholder and Dana M.
Brown, both of McGuire Woods, L.L.P., and J. Randall Davis, of Cassiday,
Schade & Gloor, of Waukegan, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

Pursuant to a supervisory order issued by the Illinois Supreme
Court on October 2, 2002 (*Andrade v. General Motors Corp.*, 201 Ill.
2d 559 (2002)), this court vacated its initial decision in this case,
entered on May 7, 2002 (*Andrade v. General Motors Corp.*, No. 2—01—
0480 (2002) (unpublished order under Supreme Court Rule 23)), and
reconsidered the matter in light of *Simmons v. Garces*, 198 Ill. 2d 541
(2002). The following opinion represents our resolution of all issues on
appeal.

Plaintiff, Jennifer Andrade, sued defendant, General Motors Corp.,
for injuries she sustained when the 1998 Chevrolet Cavalier she was
driving was struck in the rear by a Ford Taurus driven by Jerry
Vojtech. The impact forced plaintiff's seat to recline violently and her
body to slide back along the seat until her head forcefully struck the
backseat, breaking her neck and rendering her partially paralyzed.
Claiming the seat was too weak to sustain a reasonably foreseeable
impact to the rear end of the Cavalier, plaintiff alleged strict liability,
failure to warn, and negligence. A jury found against plaintiff on all
three counts. The trial court subsequently denied plaintiff's motion

for a new trial on the negligence and strict liability counts and for judgment notwithstanding the verdict or, in the alternative, a new trial on the failure-to-warn count. Plaintiff appealed, and defendant cross-appealed. Plaintiff died during the pendency of this appeal, and the co-executors of her estate, Gilbert Andrade and Lynn Andrade, were substituted as plaintiffs-appellants. For ease of discussion, we will refer to plaintiffs-appellants as plaintiff.

Plaintiff reasserts on appeal the following bases for a new trial on all counts: (1) the trial court refused to admit as substantive evidence a study of 50 accidents involving defendant's vehicles undertaken by defendant's legal and engineering staff; (2) the trial court refused to consider affidavits from the jurors indicating that they considered plaintiff's size and weight to have been a cause of her injuries; (3) plaintiff was prejudiced by defendant's expert's demonstration of how plaintiff wore her seatbelt at the time of the accident; (4) the general verdict in favor of defendant was inconsistent with the jury's answer to one of the special interrogatories; (5) the trial court discharged the jury without resolving the apparent contradiction; and (6) certain of the special interrogatories did not adequately reflect the issues in the case. Plaintiff also reasserts her argument that the jury's verdict on the failure-to-warn count was against the manifest weight of the evidence. In its cross-appeal defendant argues that the trial court erred in refusing to seal the transcripts of the trial proceedings that contain references to the content of the 50-case study. We affirm.

Plaintiff was driving her 1998 Chevrolet Cavalier on April 3, 1998, when she stopped at a red light. The Cavalier was then struck from behind by a Ford Taurus traveling at about 50 miles per hour. The collision occurred because the driver of the Taurus, Jerry Vojtech, was driving inattentively. When paramedics arrived, they discovered that plaintiff's seat was reclined, its back resting against the bench seat in the back of the car. Plaintiff had slid back on the driver's seat; her buttocks were against the back of the seat and her head against the bench seat in the back of the car. Plaintiff was found to have sustained spinal fractures resulting in paraplegia.

In the first count of a three-count complaint against defendant, plaintiff alleged strict liability, asserting that the driver's seat in the 1998 Chevrolet Cavalier "was unreasonably dangerous in that a foreseeable rear collision would likely collapse the seat quickly into the rear seat area of the vehicle causing the driver to be thrown head-first into the rear seating area." In the second count, plaintiff alleged that defendant was liable for failing to warn her about the "dangerous propensity" of the driver's seat. In her third count, plaintiff claimed that defendant was liable in negligence for (1) installing seats in the

1998 Chevrolet Cavalier that were "incapable of resisting a reasonably foreseeable rear end collision"; (2) failing "to follow its own testing and experimental data which had established that the type of front seats used in the Cavalier vehicle did not protect the occupant from serious injury caused when the seat back collapsed in reasonably foreseeable collision situations"; and (3) failing "to strengthen the front seats so that they would not collapse during an impact of the type experienced by the [p]laintiff."

At trial, plaintiff's and defendant's experts agreed on the mechanics of the collision and plaintiff's injury. The Taurus struck the rear of the Cavalier squarely, bumper to bumper. The impact created a "Delta V," or change of velocity, in the Cavalier of between 21 and 30 miles per hour. The change occurred in the span of only 100 to 200 milliseconds. At the time of the collision, the velocity combined with plaintiff's body weight, which was between 250 and 260 pounds, to create a total force on the driver's seat of between 25,000 and 30,000 pounds. Yielding to the force, the driver's seat reclined and plaintiff was propelled headfirst into the backseat, where she injured her neck.

Plaintiff's and defendant's experts disagreed at trial over whether the backs of the front seats in the 1998 Cavalier were sufficiently resistant against the threat that a rear impact would cause the seats to forcibly recline and "ramp" the occupant into the backseat of the car, as happened with plaintiff. The parties agreed on the following facts relevant to that dispute: (1) when claimant's 1998 Cavalier was manufactured, federal standards required front seat-backs of automobiles to withstand a minimum of 3,300 pounds, and defendant required its front seat-backs to withstand at least 6,600 pounds; (2) the front seat-backs in the 1998 Cavalier could withstand 11,000 pounds; (3) plaintiff's body weight at the time of the accident placed her in the 99th percentile of body weights for both male and female drivers; and (4) the largest crash test dummy available when the 1998 Cavalier was designed weighed 217 pounds, which was in the 95th percentile of male drivers. Plaintiff's and defendant's experts disagreed over whether plaintiff's body weight at the time of the accident was beyond the design range for the 1998 Cavalier front seats. Also, plaintiff and defendant presented conflicting interpretations of data showing the frequency of rear-impact accidents resulting in injuries due to collapsing seat backs.

Much of the testimony at trial reflected apparently irreconcilable differences between two schools of thought on seat resistance. Plaintiff's experts claimed that nonyielding seats generally are safer because the occupant of a front seat can withstand a much greater rear impact without injury while seated upright than while in a prone

position, which increase the risk for neck injuries caused by a head-first collision with the backseat. Defendant's experts claimed that nonyielding seats place occupants at a far greater risk for whiplash injuries than do yielding seats. Yielding seats, they contended, also reduce the likelihood that an occupant will rebound off the seat into the ceiling of the car or into the steering wheel or dashboard. Plaintiff's experts testified that a nonyielding seat would have prevented plaintiff's injuries. Defendant's experts insisted that plaintiff would have been paralyzed even with a nonyielding seat because the force of the impact would have "ramped" her headfirst into the ceiling of the car.

After the jury rendered a general verdict in favor of defendant on all counts of plaintiff's complaint, the jury answered several special interrogatories in the negative. The interrogatories relevant here are the following (the numbering is added here for convenience):

    (1) "Was the seat in plaintiff's 1998 Chevrolet Cavalier designed by General Motors unreasonably dangerous?"

    (2) "Was General Motors negligent in the design of the seat in plaintiff's 1998 Chevrolet Cavalier?"

    (3) "Did General Motors fail to exercise ordinary care for the safety of the plaintiff, Jennifer Andrade?"

    (4) "Did General Motors fail to adequately warn the plaintiff about the dangers, if any, of its product of which it knew, or in the exercise of ordinary care, should have known?"

    (5) "Was the conduct of Jerry Vojtech the sole proximate cause of plaintiff's injuries?"

■ Plaintiff claims there is an inconsistency between the general verdict and the answer to special interrogatory No. (5) because defendant and Jerry Vojtech were the only proximate causes that the jury legitimately could consider. If the jury found a proximate cause other than Vojtech, plaintiff contends, that cause must have been defendant. Denying plaintiff's motion for a new trial based on the alleged inconsistency, the trial court found:

"[I]t is logical that 12 lay people may conclude that the severity of the accident, the relative sizes of the car, the speeds involved or any other number of factors might have been somehow causative and, as a consequence, conclude that Mr. Vojtech in his actions *** was not the sole proximate cause."

The trial court's ruling on a motion for new trial will not be overturned unless it amounted to an abuse of discretion. *Tedeschi v. Burlington Northern R.R. Co.*, 282 Ill. App. 3d 445, 448 (1996).

■ We reject plaintiff's argument for two reasons. First, we agree with defendant that the issue of whether the design of the 1998 Chevrolet Cavalier's front seats contributed to plaintiff's injuries was

mooted by the jury's finding that the seats were not unreasonably dangerous and that defendant's design of the seats did not constitute a lapse of ordinary care. An essential element of strict liability and failure to warn is that the product causing the plaintiff's injury was unreasonably dangerous. See *Hansen v. Baxter Healthcare Corp.*, 309 Ill. App. 3d 869, 880-81 (1999); *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 327 (1999). An essential element of negligence is that the conduct of the defendant that caused the plaintiff's injury constituted a lapse of ordinary care. See *Lode v. Mercanio*, 77 Ill. App. 3d 150, 154 (1979). Plaintiff does not challenge the sufficiency of the evidence supporting the jury's findings on these elements with respect to the strict liability and negligence counts. Although plaintiff does challenge the sufficiency of the evidence concerning the failure-to-warn count and asks that a judgment notwithstanding the verdict be entered on that count, we reject that argument. Because plaintiff has not successfully challenged the jury's finding that defendant was not at fault in designing the driver's seat in the Cavalier, the issue of whether plaintiff's injuries were caused by the design of that seat is moot.

Even if we were to reach plaintiff's allegation of an inconsistency between the general verdict and the jury's answer to special interrogatory No. (5), we would reject the argument. "When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2—1108 (West 2000). However, a general verdict and a special interrogatory are inconsistent only when the answer to the interrogatory is clearly and absolutely irreconcilable with the general verdict. *Kessling v. United States Cheerleaders Ass'n*, 274 Ill. App. 3d 776, 779 (1995). All presumptions are given in favor of the general verdict. *Kessling*, 274 Ill. App. 3d at 779-80. When a special interrogatory does not cover all the issues submitted to the jury, and a "reasonable hypothesis" can resolve the alleged inconsistency, the special interrogatory will not control. *Kessling*, 274 Ill. App. 3d at 780.

The trial court instructed the jury pursuant to Illinois Pattern Jury Instructions, Civil, No. 15.01 (1995) (hereinafter IPI Civil (1995)), which states:

> "When I use the expression 'proximate cause,' I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

IPI Civil (1995) No. 15.01 places no limit on the number of proximate causes a jury might find to have resulted in a particular injury. Indeed,

it is axiomatic that there may be more than one proximate cause of an injury. See *Bentley v. Saunemin Township*, 83 Ill. 2d 10, 17 (1980). Moreover, "proximate cause" is not synonymous with "negligent cause." *McDonnell v. McPartlin*, 192 Ill. 2d 505, 523 (2000). An injury may be caused by one or more nonnegligent, or nonhuman, causes. See *McDonnell*, 192 Ill. 2d at 523.

We disagree with plaintiff that the instructions given by the court did not permit the jury to consider nonnegligent or nonhuman causes in reaching its findings. Plaintiff claims that such consideration was foreclosed by IPI Civil (1995) No. 12.04, which states:

> "More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

> However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant."

Plaintiff emphasizes the reference to "some person" and contrasts this instruction with IPI Civil (1995) No. 12.05, which the parties, after discussion, decided not to submit to the jury. That instruction reads:

> "If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

> However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."

Plaintiff suggests that, since IPI Civil (1995) No. 12.05 was not given, the jury should not have considered "something," *i.e.*, a nonnegligent cause, to have been the cause of plaintiff's injuries. We see no such limitation in any of the instructions given to the jury. IPI Civil (1995) No. 12.04 instructs the jury to find for the defendant if it determines that a human agent other than the defendant was the sole proximate cause of the plaintiff's injury. The instruction itself neither explicitly nor implicitly bars the jury from finding for defendant upon determining that plaintiff's injuries were brought about not by any negligent conduct by defendant but by the negligence of Jerry Vojtech combined with one or more nonnegligent causes. Even in the absence of IPI Civil (1995) No. 12.05, the jury could consider any cause that met the broad definition of "proximate cause" contained in IPI Civil (1995) No. 15.01, which does not distinguish between negligent and nonnegligent causes.

The evidence revealed several nonnegligent causes at work in plaintiff's injuries. According to the expert testimony that defendant presented at trial, the force that reclined the front seat and propelled plaintiff into the rear seat was the product of several factors including the speed of the Taurus, the relative weights of the Taurus and the Cavalier, the strength of the seat in which plaintiff sat, and plaintiff's body weight. Dr. Joseph Rice, a mechanical engineer, testified as follows:

"Q. What is your understanding with regard to the severity of this accident relative to all rear impacts *** ?

A. Well, the percentile in terms of the change in velocity is probably about 98, 95th to 98th percentile. And that's talking about reported accidents.

* * *

Ms. Andrade is larger than a 95th percentile male in terms of her body mass, so the combination ends up on to [sic] pretty extreme—pretty high percentile of occurrences.

Q. When you say 'the combination', you're talking about the severity of the impact in combination with the load you put on the seat?

A. Yes."

Dr. Smith, an automotive engineer, described how the rear collision caused plaintiff's seat to collapse:

"The car—her car, will come forward. She will want to remain stationary until her seatback and her seat itself come forward and catch her, or tries [sic] to push her.

She will resist that with her weight. She will resist that against the seatback with what is considered to be some portion of her mass, typically taken at 60 percent, some people use 70 percent, but 60 percent of the 200 and—260 pounds, she would then resist being moved and that creates an effective force against the seatback.

In this case, at 26 to 30 miles an hour Delta V, that force is considerable.

It will—it will yield or it will yield a calculational number of between 25,000 and 30,000 inch pounds of loading on the seat, depending on whether you use 26 miles an hour Delta V, or 28 miles Delta V.

The seat design per GM, as you heard from [Dr.] Rice, their standard is double of the [Federal Motor Vehicle Safety Standard], or 6,000 pounds.

Now, this seat will withstand more than that, but that's the minimum design range for GM.

But even beyond that, it's not going to resist 25,000 to 30,000 inch pounds.

And so the seat will begin to yield. It will begin to yield as she loads it.

* * *

And as the seat goes back further then, she will come up and this will allow her to slide and go up and impact with her head towards the back."

In both opening and closing arguments, counsel for defendant identified several causes involved in plaintiff's injuries. In opening argument, counsel stated:

"What you're going to learn in this case is that the real cause of the injuries here is not an unreasonably dangerous design of the seat because you'll hear from the evidence why this is a proper design ***.

So you're going to—we need to tell you more about the magnitude of this impact, the severity of the impact because it was a severe, high-speed impact. And you're going to learn that the real cause of Jennifer's injury was the severity of this impact. The fact that Mr. Jerry Vojtech driving that Ford Taurus drove into the back side of the Andrade car, he was the sole cause in effect—."

At this point, plaintiff's counsel objected on the ground that the remarks were "conclusory." The court sustained the objection. Counsel for defendant continued:

"You're going to see from the evidence that the seat deformed and absorbed energy. And we're going to explain the difference between a collapse of a seat and a yield, a deformation, a bending of the seat. ***

* * *

You'll see that the driver's seat did not collapse. ***

You'll see evidence that the driver's seat did not cause the plaintiff's injuries in this case. And you'll see evidence that Mr. Vojtech, the driver of that bullet car, the Taurus, caused the accident and Ms. Andrade's injuries, that he was the sole cause of her injuries.

* * *

*** [Jerry Vojtech] never saw the Cavalier before he hit it.

So it was a big hit according to the evidence, a huge hit into the back of that Cavalier. It was a very high-speed impact that is the cause of Ms. Andrade's injuries in this case.

* * *

*** G, remember, is the acceleration due to gravity. Thirty-two feet per second per second. ***

And that's the kind of G's or what accelerated this car. G's are

what put the force into this car. G's are what caused the deformation of the seat.

\* \* \*

It's this 28-to-30-mile-per-hour Delta V that Ms. Andrade was exposed to. That change in velocity of her car is an extremely high Delta V. \*\*\*

\* \* \*

\*\*\* [Dr. Smith] will explain to you that the same forces act on a car when it's lifted to the very top of the roof of a three-story building and then dropped \*\*\* three stories. It's the same force that Mr. Vojtech put into the back side of the Cavalier in this accident.

In addition to having large speed, there was also a large load in this case. That is the size—the force has to do with both acceleration, change in speed, and mass, weight, which is effectively weight, divided by acceleration. And so you need to consider both the weight that is acting on the seat and also the speed that is acting on the seat and now let's talk about the load, the weight that is acting on the seat and that is also unusual. That is, it was also a high load.

Ms. Andrade weighed 260 pounds at the time of the accident and that made her a 99 percentile woman. That is to say, 99 percent of women weigh less than that. So we have a 99-percentile accident with an impact speed with a 99-percentile occupant. That's very rare. It's unique."

In closing argument, defendant's counsel stated:

"It's our position, as we said in opening statement and said throughout this case, that we believe that General Motors did not cause Ms. Andrade's injury, that the real cause here is that this is a real high-speed impact. No matter what anyone says about the severity of this collision, we know that it's way up into the 90th, 95th, 98th percentile of all accidents, the severity of it.

And it's our position that the real sole cause of Ms. Andrade's injury is Mr. Vojtech, who ran into her. And, moreover, that the seat did not cause the plaintiff's injuries. The seat, even if it was designed differently, wouldn't have prevented the plaintiff's injuries.

\* \* \*

\*\*\* [A] special interrogatory that you're going to be asked to answer and sign is whether, \*\*\* if you were to find that there was something unreasonably dangerous about the seat, then you go on to whether it's a cause of Ms. Andrade's injuries in this case, whether it's a proximate cause. Whether some unreasonably dangerous condition of that seat by natural and probable sequence

caused her injury is the issue you need to decide. That is, was it the seat or was it the severity of the collision? Was it Mr. Vojtech that was the real and sole proximate cause?

\* \* \*

And then the last issues we believe are whether Mr. Vojtech caused the accident and her injuries and whether his conduct was the sole proximate cause of her injuries. Plaintiff's counsel in closing argument suggests that [Vojtech] didn't have anything to do with her injury. He just caused the accident and not her injury. Well, if he had been paying attention \* \* \* he wouldn't have hit her so hard. Wouldn't have bashed into the rear end. Wouldn't have had more energy available to deform the seat like it did.

So, as I said on opening, the focus here is on the severity of the collision, the high speed of this accident and how it stacks up in relationship to the range of accidents. Mr. Vojtech, who didn't ever see the Cavalier before he it [sic], caused a very severe collision. \*\*\*

\* \* \*

Again, it's our position that this was a very high-speed collision that caused very large forces. Delta V, 26 to 30. Cavalier goes from standing still up to a speed of about 28 miles per hour, gets accelerated so fast in a tenth of a second to a sixth of a second, between a hundred milliseconds and about a hundred and sixty milliseconds, much less than the blink of an eye, goes from zero up to 28. Big wack [sic] to the back, tends to put a lot of load on that seatback as it tries to push Ms. Andrade forward. Everybody agreed that the load on the seatback was high.

\* \* \*

So, in summary, it's our position that while this is a horrible injury, General Motors is not at fault for it. The responsibility for the accident is with Mr. Vojtech. He caused this high-speed collision. He generated these very high forces on Ms. Andrade's car and on her seat. The seat deformed and it yielded as designed as a result of these high forces, not as a result of failure.''

The jury reasonably could find that one or more of the nonnegligent causes referenced in the testimony of defendant's experts and the arguments of counsel had combined with the inattention of Jerry Vojtech in causing plaintiff's injuries. Such a finding would be perfectly consistent with the general verdict in favor of defendant. That is, the jury logically could have found that defendant was not negligent in designing its automobile seats and, yet, that plaintiff's injuries would not have occurred but for (1) the weight limitation of the seats, and (2) Vojtech's negligence. The jury, that is, could have found that

plaintiff's injuries were the result of Vojtech's negligent conduct and defendant's nonnegligent conduct.

Although counsel for defendant at times remarked that Vojtech's conduct was the sole proximate cause of plaintiff's injuries, these remarks could not have limited the scope of the jury's consideration of possible causes. "It is the exclusive province of the trial court to instruct the jury as to the law, and it is not the function of counsel to do so." *Lounsbury v. Yorro*, 124 Ill. App. 3d 745, 748 (1984). The instructions given by the trial court allowed for consideration of causes besides Vojtech's conduct—indeed, of any cause that met the definition of "proximate cause" in IPI Civil (1995) No. 15.01. Consequently, we find no inconsistency between the general verdict and the special finding.

*Simmons v. Garces*, 198 Ill. 2d 541 (2002), does not warrant a different conclusion. In *Simmons*, plaintiff sued defendant, a physician, for wrongful death, claiming that defendant's negligence was the proximate cause of the death of plaintiff's baby daughter, LaTonya. Plaintiff adduced evidence at trial that she consulted defendant over the phone and in person intermittently over the course of an entire day because LaTonya was drowsy, had diarrhea, and refused to eat. Defendant initially told plaintiff to feed LaTonya a particular brand of baby formula. When LaTonya refused the formula, plaintiff again consulted defendant, who told her to try a different baby formula and, failing that, to take LaTonya to the emergency room because she might be dehydrated. Plaintiff brought LaTonya to the emergency room without feeding her more formula. LaTonya was found dead on arrival.

Plaintiff presented the testimony of the pathologist who conducted the autopsy. The pathologist testified that LaTonya died of dehydration due to gastroenteritis. Plaintiff also called an independent expert, Dr. Given, who agreed that LaTonya's death was due to dehydration and opined that defendant's failure to have the child hospitalized for the administration of intravenous fluids was more likely than not the cause of the child's death. Defendant's experts opined that LaTonya's death was caused not by dehydration but hypothermia, or possibly suffocation.

According to the jury instructions, the plaintiff's claim was that the defendant was negligent in failing to refer LaTonya to a physician or hospital for examination, diagnosis, or IV treatment. The trial court gave the jury IPI Civil (2000) No. 15.01 in its entirety. At the defendant's request and over the plaintiff's objection, the court submitted the following special interrogatory: "Did dehydration contribute to cause the death of LaTonya King?" *Simmons*, 198 Ill. 2d

at 553. The jury returned a general verdict in favor of the plaintiff but answered the special interrogatory in the negative. The trial court found the general verdict irreconcilable with the special finding and granted the defendant's motion for judgment notwithstanding the verdict. The supreme court agreed that there was an inconsistency:

"Plaintiffs here presented the testimony of one expert, Dr. Given, who opined that LaTonya was severely dehydrated and that this contributed to her death. According to Dr. Given, it was more likely than not that LaTonya would have survived if Dr. Garces had intervened with appropriate IV fluids.

*** [P]laintiffs presented no expert testimony establishing any cause of death other than dehydration. In addition, while defendant's experts did suggest other possible causes, *i.e.*, hypothermia and suffocation, plaintiff's attorney disputed these theories in closing argument. Moreover, the trial record reveals no expert testimony establishing that Dr. Garces would have been to blame if LaTonya died from either of these other causes. Plaintiffs' counsel conceded as much when, in arguing against the giving of the special interrogatory, he stated that if the jury thought LaTonya died of suffocation, 'there's been no testimony from the plaintiffs that suffocation would make the doctor responsible, so [the jurors] wouldn't even get to this. They would be on verdict form B [in favor of Dr. Garces].' Absent expert testimony linking Dr. Garces' conduct to death by hypothermia or suffocation, and given the jury's rejection of dehydration as a cause of death, there is no reasonable hypothesis remaining on which to reconcile the jury's special finding with the general verdict." *Simmons*, 198 Ill. 2d at 557.

We find *Simmons* distinguishable from the present case. The special finding in *Simmons* that dehydration was not a cause of the victim's death conflicted with the general verdict in favor of plaintiff because dehydration was the only cause of death identified by plaintiff's expert testimony and the only cause argued by plaintiff's counsel. Here, the special finding that the conduct of Jerry Vojtech was not the sole proximate cause of plaintiff's injuries did not contradict the general verdict in favor of defendant because the expert testimony presented by defendant identified several nonnegligent factors that, concurrently with Vojtech's conduct, caused the collision and the resulting collapse of plaintiff's seat. Counsel for defendant stressed throughout its opening and closing arguments that plaintiff's injuries were the result of a confluence of causes that included Vojtech's negligence, the speed of the Taurus, the relative weights of the vehicles, plaintiff's own body weight, and the strength of her seat. While counsel for defendant repeatedly stated that Vojtech's conduct was the sole proximate cause of plaintiff's injuries, counsel also repeat-

edly linked Vojtech's conduct with two particular causal factors: the speed of the Taurus and the severity of the collision. Moreover, counsel identified other causal factors for which Vojtech, obviously, could have had no responsibility, *i.e.*, the weight limitations of the seat and plaintiff's body weight. We see nothing in the jury instructions that precluded the jury from finding that these nonnegligent causes, in combination with Vojtech's negligence, caused plaintiff's injuries. Therefore, we see no inconsistency between the general verdict in favor of defendant and the special finding that Vojtech was not the sole proximate cause of plaintiff's injuries. Because there was in fact no inconsistency for the trial court to resolve, we also reject plaintiff's argument that the trial court should have submitted additional interrogatories to the jury in light of the special finding.

Plaintiff's remaining contentions on appeal, as well as defendant's contention on its cross-appeal, are addressed in an unpublished portion of this disposition.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

BOWMAN and BYRNE, JJ., concur.