EDWARD BRECK *et al.*, Adm'rs of the Estate of David E. Breck, Deceased, Plaintiffs-Appellants, v. EDWIN G. CORTEZ *et al.*, Defendants (Alex Kikilas *et al.*, Defendants-Appellees).

Second District   No. 84—1106

Opinion filed February 21, 1986.

Robert E. Dyer and Reese J. Peck, both of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellants.

Stewart Diamond and Robert K. Bush, both of Ancel, Glink, Diamond, Murphy & Cope, of Chicago, and James L. DeAno and Patricia L. Argentati, both of O'Reilly, Cunningham, Duncan & Huck, of Wheaton, for appellees.

JUSTICE SCHNAKE delivered the opinion of the court:

Plaintiffs, Edward Breck and Carol Gray, are the co-administrators of the estate of their son, David Breck, who died as a result of injuries he sustained in a collision between the car he was driving and a car driven by Edwin Cortez. At the time of the collision, Cortez' car was being pursued by the police. Plaintiffs brought this wrongful death action against Cortez; Matthew Bandur, the registered owner of the car Cortez was driving; Alex Kikilas and David Skala, police officers involved in the pursuit of the car driven by Cortez; and the village of Bolingbrook and the city of Darien, the employers of Kikilas and Skala, respectively. The court entered summary judgment in favor of Bandur, and he is not involved in this appeal. The counts of the complaint directed against the police officers and their employers were counts II and IV. Count II alleged that the police were negligent in their pursuit of Cortez, and count IV categorized the actions of the police in the pursuit as wilful and wanton misconduct. The court dismissed count II as to defendants Skala and the city of Darien, and that dismissal order is not before us. Subsequently, the court entered summary judgment in favor of both police officers and their municipalities on the remaining counts. Plaintiffs are appealing that summary judgment pursuant to Supreme Court Rule 304(a) (87 Ill. 2d R. 304(a)).

In deciding the motion for summary judgment, the trial court considered the depositions of defendants Kikilas, Skala, and Cortez, as well as the deposition of Edward Hradecky, whose car was passed by Cortez and the police shortly before the accident.

Officer Kikilas, in his deposition, testified that on the date in question, November 10, 1982, he and his partner, Officer Hugo, were assigned to routine patrol. Kikilas was driving the police car. At about 9 p.m. they were proceeding southbound on Route 53. It was dark out. When they stopped at a red light at 107th Street, Kikilas observed a black and yellow Dodge coming north on Route 53 toward the intersection. At that point Route 53 was a four-lane highway, and with a left-turn lane in the middle of the road. The Dodge was proceeding with its headlights off, and it appeared to be accelerating. At the intersection the Dodge made a U-turn onto the right-hand southbound lane of Route 53. In the course of making the U-turn, the Dodge spun around 360 degrees and forced a vehicle that had been turning onto Route 53 from 107th Street off of the roadway. Kikilas estimated that, just prior to the U-turn, the Dodge was going 40 to 45 miles per hour.

Kikilas testified that after the Dodge made the U-turn, he acti-

vated his overhead lights and siren, drove through the intersection, and began to follow the Dodge. He described traffic as light to medium, and weather conditions as misty. The roads were wet. As he followed the Dodge south on Route 53, it changed lanes more than once. It ran a red light at 111th Street. At this point the officers radioed the station that they were pursuing a black and yellow Dodge. The call was acknowledged. When the Dodge approached the I-55 interchange, it was in the left lane. It made a sharp right-hand turn onto the entrance ramp to southbound I-55. The Dodge then made a U-turn on the entrance ramp and returned to Route 53. The Dodge then proceeded southbound and made a hard left turn onto the entrance ramp to northbound I-55. At that point its lights were still off. Kikilas testified that the distance from 107th Street to I-55 is about a mile, and that as he followed the Dodge for that mile, he (Kikilas) did not drive faster than 35 to 40 miles per hour. He said the Dodge was going 40 to 45 miles per hour.

Kikilas testified that he followed the Dodge onto I-55. He described traffic on the interstate highway as light to medium. He tried to stay about a quarter of a mile behind the Dodge. At one point it drove onto the shoulder and then returned to the roadway. While following the Dodge on I-55, the officers made a report to State Police District 5, and a message was broadcast over ISPERN (Illinois State Police Emergency Radio Network) that a Bolingbrook unit was in pursuit of a black and yellow Dodge northbound on I-55. The Dodge drove off of I-55 and onto the exit ramp leading to southbound Cass Avenue. Kikilas slowed down as he approached the exit ramp, and the distance between his car and the Dodge increased. Kikilas testified that at that point Officer Skala radioed that he had visual contact with the Dodge. When Kikilas reached Cass Avenue, he saw Skala "engage his lights" and follow the Dodge. Kikilas estimated the distance from Route 53 to Cass Avenue along I-55 at five miles. He said that during the pursuit on I-55, the fastest he drove his police car was 60 to 65 miles per hour. The Dodge was traveling at about the same speed.

Kikilas testified that when he exited I-55, he lost sight of the Dodge. When he reached Cass Avenue, he had lost sight of Skala's police car. Kikilas then drove southbound on Cass Avenue at about 35 to 40 miles per hour until he arrived at the scene of the collision, which was 3½ miles from I-55. At the scene Skala's police car was off of the road on the west side. The Dodge and a small Toyota which had been driven by David Breck were on the east side of the roadway. Kikilas arrested the driver of the Dodge who was identified as Edwin

Cortez.

Officer Skala testified that on the night in question he was on patrol in his police car. He was advised over ISPERN that a Bolingbrook unit was in pursuit of a black and yellow Dodge northbound on I-55 for traffic offenses. Skala parked his police car on the median strip on Cass Avenue over the interstate highway. He first saw the Dodge just before it entered the ramp leading to southbound Cass Avenue. At that point its headlights were on. Skala stated that in the distance he could see the overhead lights of the Bolingbrook car. When the Dodge turned off of I-55, Officer Skala activated his overhead lights and siren and began to follow it southbound on Cass Avenue. He radioed the Darien police department that he was in pursuit of the vehicle Bolingbrook had been chasing. He subsequently advised State Police District 2 that he was pursuing the Dodge.

Skala testified that he followed the Dodge until the collision occurred. He had sight of the vehicle through two curves in the road and a straightaway. The Dodge accelerated in the straightaway, and Skala lost sight of it as it entered a third curve. When Skala entered the third curve, he depressed his brake slightly and lost control of his car. It spun around about five times and slid into a ditch on the west side of the road. Skala looked over to the east side of the roadway and saw that the Dodge had collided with another vehicle. Skala stated that the first curve was a 45-mile-per-hour curve; the second was a 35-mile-per-hour curve, and the last one was a 45-mile-per-hour curve. From the point where he began following the Dodge to the point where he lost sight of it, the distance between his car and the Dodge remained the same. Skala was asked how fast the Dodge was traveling, and he replied that "[a]t different points the speeds changed of the vehicle due to the road conditions and the curves." He said that its speed ranged from 45 to 60 miles per hour. Skala stated that his speed ranged between 45 and 55 miles per hour. When the Dodge entered the first two curves, it crossed over the center line temporarily.

Skala testified that traffic on Cass Avenue between I-55 and the place where the collision occurred was very light. In the straightaway which preceded the third curve the Dodge passed another southbound vehicle by going over the gravel shoulder on the right. Skala stated that when his car went into the ditch, there were only two other cars at the scene, the Dodge and the vehicle Breck had been driving. The Bolingbrook police car arrived about 15 seconds later.

Hradecky testified that on the night in question he was driving southwest on I-55 from Cicero. His wife was with him in the car. He

exited I-55 at Cass Avenue and proceeded southbound. In order to exit I-55 he had to drive under Cass Avenue and then "make a clover leaf" onto that road. Hradecky stated that when he turned onto Cass, he passed a police car which was sitting on the median strip on the bridge over I-55. It did not have its overhead lights or siren on.

Hradecky stated that at the interchange Cass Avenue had two lanes for traffic in each direction in addition to the ramps from the interstate. About a quarter of a mile south of the bridge it became a two-lane road. The two southbound lanes merged together at that point. Between I-55 and the point where the southbound lanes merged, there were two roads onto which one could turn right. The first was a frontage road that ran along the interstate, and the second was an entrance to Argonne National Laboratory. After the lanes merged, there was a road that intersected Cass from the left which led to a residential area. Hradecky described the curves that came after that road.

Hradecky testified that when he had just completed the curve which preceded the straightaway, he saw in his rear view mirrors the headlights of the Dodge approaching him from behind. They were coming up so fast that Hradecky thought the car was going to hit him. At that point Hradecky was going about 35 miles per hour, and there was a car traveling in the northbound lane. The Dodge passed Hradecky on the right. Hradecky started applying his brakes, and when the Dodge drove back onto the roadway, it threw dirt and stones up at his car. Hradecky slowed down to about 25 miles per hour. He saw the Dodge going down the straightaway in front of him for about 30 seconds, and then it disappeared around the curve where the accident took place. Hradecky estimated that the Dodge was going 45 to 50 miles per hour when it passed him, and that the maximum speed it reached while it was still in his sight was 55 to 60 miles per hour.

Hradecky testified that when the Dodge disappeared around the curve, he heard sirens behind him. He pulled over onto the shoulder of the road. He looked into his rear view mirror and saw a police car approaching with its overhead lights on. Hradecky estimated that when that car passed him, it was going 55 to 60 miles per hour. Four more police cars followed the first one past him. After the last police car passed him, Hradecky drove up to the scene of the accident. He said that the cars that had collided were "locked up" 20 feet east of the roadway.

Finally, Hradecky testified that he thought the speed limit on the portion of Cass Avenue from I-55 to the accident scene was 50 miles

per hour. He stated that the area to the west of the accident scene was "all open" and was part of Argonne. The area to the east was "[n]othing but trees." There were no residences or businesses in that location.

Cortez testified that he pleaded guilty on a charge of reckless homicide in connection with this incident and was sentenced to a three-year term of imprisonment. He was on parole at the time of his deposition. He had previously been convicted of burglary, forgery, and theft.

Cortez stated that he had bought the Dodge from Bandur about a week or two before the accident. He had not obtained insurance for the car.

On the day of the accident he was living in Bolingbrook with his parents, his girlfriend, and his brother and sister. His girlfriend worked at a Venture store on 22nd Street in Oak Brook. He did not have a valid driver's license and was on parole in connection with the burglary and forgery convictions. At about 6:30 or 7 p.m. he visited his girlfriend at her place of employment during her "luncheon break." During this visit he smoked a marijuana cigarette in the Venture parking lot. Cortez said that he had taken PCP a couple of days previously. He stated, "[W]hen you take PCP and you smoke marijuana—you could do PCP like today and two days later smoke a joint and shoot right back up." By the time of the accident he was "pretty high." From the Venture store he drove his Dodge home. He only stayed there for about five minutes because he "got real paranoid." He left to go pick up his girlfriend who was scheduled to finish her work at 10 p.m. He planned to take I-55 to Route 83, and Route 83 to 22nd Street, where the Venture store was located.

In order to get on I-55, Cortez had to drive north on Route 53, turn around, and then drive south on Route 53 to the I-55 entrance ramps. He could not turn south onto Route 53 from the street his house was on because of a raised median strip. Cortez testified that he drove north to 107th Street and made a U-turn onto one of the southbound lanes of Route 53. He was not sure whether he had his headlights on. He believed that as he approached and entered the intersection, there was a green arrow on the traffic light. He could not remember whether, in making the U-turn, his car spun 360 degrees or forced another vehicle off of the pavement. He did not notice that the police began to chase him at that point. He did not notice them until he was on I-55.

When he approached 111th Street, the traffic light was red. He stopped his car, saw there was no traffic on 111th, and then went

through the red light. Cortez testified that the reason he went through the light was that he "was just really paranoid." He said that he "just had to hurry up and get out of there for some reason."

Cortez related how he proceeded south on Route 53 to I-55, entered a ramp on the right, made another U-turn, and then turned onto the ramp leading to northbound I-55. On I-55 he was driving about 60 miles per hour until he reached Lemont Road. At that point he saw the overhead lights on the Bolingbrook police car. He did not know if the police were after him, but he thought they were. Cortez said that he was "freaked out" and scared so he accelerated to 75 or 80 miles per hour. He planned to exit I-55 at Cass Avenue and drive south on Cass where there were places he could hide from the police. Cortez passed a truck by driving on the shoulder of I-55 and then turned onto the exit ramp. When he did so, he saw a police car waiting on the overpass. He entered the ramp at about 80 miles per hour and did not apply the brakes while on the ramp. Once he reached Cass Avenue, he did not look back to see whether the police were following him. He said that he had learned from experiences with street gang members that if he had to run, it was better if he did not look back. He said, "If you look you are going to get more scared." He did not hear a siren at any time while he was on Cass.

Cortez testified that he decreased his speed when he drove into the curves. He said he took the first two curves at 45 or 50 miles per hour. He described how he passed Hradecky on the right, and how he lost control of his car on the next curve and collided with Breck's car. He said that where he lost control of his car the speed limit was probably reduced to 30 miles per hour, and he was going 45 to 50. He said that as far as he knew, Breck was driving in the proper lane. Cortez did not see Breck's car until he hit it.

■ It was based on the evidence recounted above that the trial court entered summary judgment in favor of the police officers and their municipalities. Section 2—202 of the Local Governmental and Governmental Employees Tort Immunity Act provides:

> "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton negligence." (Ill. Rev. Stat. 1983, ch. 85, par. 2—202.)

The police officers here were public employees within the meaning of that provision. (Ill. Rev. Stat. 1983, ch. 85, pars. 1—206 and 1—207.) Section 2—109 of the Act provides:

> "A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not

liable." (Ill. Rev. Stat. 1983, ch. 85, par. 2—109.)

Plaintiffs here do not dispute that, in pursuing Cortez' car, the police officers were engaged in the enforcement of the law. In order to recover from the police officers or their municipalities, therefore, plaintiffs must prove wilful and wanton negligence. See *Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 436 N.E.2d 623.

The elements of a cause of action for wilful and wanton negligence are a duty to the injured party, and a breach of that duty which is a proximate cause of the injury. (See *Hubbard v. Aetna Insurance Co.* (1976), 37 Ill. App. 3d 666, 347 N.E.2d 396.) The issue of duty, that is, whether the defendants and the plaintiffs stood in such a relationship to one another that the law imposed upon the defendants an obligation to meet a standard of conduct for the benefit of the plaintiffs, is a question of law for determination by the court. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 440 N.E.2d 96.) We agree with plaintiffs that police officers owe the general public a duty to refrain from wilful and wanton misconduct in the pursuit of suspected law violators. Section 11—205 of the Illinois Vehicle Code exempts drivers of authorized emergency vehicles from speed limits and certain other rules of the road. Such a driver is permitted to exceed the maximum speed limits, however, only "so long as he does not endanger life or property." Moreover, subsection (e) of the statute provides:

> "The foregoing provisions [exemptions from certain rules of the road] do not relieve the driver of an authorized emergency vehicle from the duty of driving with due regard for the safety of all persons, nor do such provisions protect the driver from the consequences of his reckless disregard for the safety of others." (Ill. Rev. Stat. 1983, ch. 95½, par. 11—205.)

This court has previously recognized a duty of care on the part of the police for the safety of the public when they are engaged in a pursuit of a suspected law violator. See *Brooks v. Lundeen* (1977), 49 Ill. App. 3d 1, 364 N.E.2d 423; *Sundin v. Hughes* (1969), 107 Ill. App. 2d 195, 246 N.E.2d 100.

We disagree, however, with plaintiffs' argument that the evidence here could support a finding that the police officers were guilty of wilful and wanton negligence. We are aware that the question of whether conduct amounts to wilful and wanton negligence is normally a question of fact for determination by the jury (see *Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 436 N.E.2d 623), and that summary judgment should not be granted if there is a genuine issue as to any material fact (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005). The question of wilful and wanton misconduct may, however, be

determined by the court on a motion for a directed verdict if the evidence meets the standard enunciated in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, that is, if all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary determination based on that evidence could ever stand. (*Stamat v. Merry* (1979), 78 Ill. App. 3d 445, 397 N.E.2d 141; *Lewandowski v. Bakey* (1975), 32 Ill. App. 3d 26, 335 N.E.2d 572.) Summary judgment is also proper if the evidence meets the *Pedrick* standard. See *Thompson v. Platt* (1983), 116 Ill. App. 3d 662, 452 N.E.2d 733 (issue of contributory negligence properly decided on motion for summary judgment where evidence met *Pedrick* standard).

■ In order for a defendant's acts or omissions to be characterized as wilful and wanton, they must have been committed with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others. (*Harvey v. Norfolk & Western Ry. Co.* (1979), 73 Ill. App. 3d 74, 390 N.E.2d 1384.) In evaluating the conduct of the police officers here, we must be mindful of the reason for their pursuit of Cortez. The evidence in the instant case, even when viewed in its aspect most favorable to plaintiffs, establishes that Cortez was driving his car in a reckless manner and endangering the public before the police began to chase him. Officer Kikilas testified that when Cortez made the U-turn at Route 53 and 107th Street, his car spun around 360 degrees and forced another car, which was turning onto Route 53, off of the road. Cortez did not deny that this occurred. He testified only that he could not remember whether it happened or not, which was quite understandable in light of the fact that, when he was driving, he was under the influence of drugs. Under these circumstances, a failure on the part of the police to act would have presented a substantial threat to public safety. Moreover, although all high speed pursuits of suspected law violators involve risk to other motorists and pedestrians on the road, the circumstances here did not make the pursuit exceptionally hazardous. The pursuit of Cortez, at least near the scene of the collision, took place on a two-lane road in an unincorporated area where there were no businesses or residences. Although the roads were wet, the evidence, considered in its aspect most favorable to plaintiffs, establishes that at the scene of the collision the police were traveling only 5 to 15 miles per hour over the speed limit. Considering the danger to the public created by Cortez' presence on the roads and the nature of the pursuit involved here, we conclude that the police officers did not act with utter indifference to or conscious disregard for the safety of oth-

ers. (See *Stanton v. State* (1970), 26 N.Y.2d 990, 311 N.Y.S.2d 28, 259 N.E.2d 494; *Dunn v. State* (1971), 29 N.Y.2d 313, 327 N.Y.S.2d 622, 277 N.E.2d 647.) The evidence here, considered in its aspect most favorable to plaintiffs, so overwhelmingly favors defendants that no contrary conclusion could ever stand.

■ Plaintiffs have brought to our attention the published policies of the Bolingbrook and Darien police departments regarding high speed chases of suspected law violators. In our judgment, these published policies do not support the argument that, under the circumstances of the instant case, there is a genuine issue of fact on the question of wilful and wanton negligence. We do not consider it necessary to set out all of the pertinent passages of these documents verbatim. Suffice it to say that we have reviewed them and agree with the trial court that they do little more than to emphasize the need for caution during the pursuit of an offender. For example, the Darien publication provides:

"A discreet officer will not take undue risks to overtake a motorist whose only violation is a minor, non-hazardous offense. Violators who commit hazardous moving offenses should be stopped if possible, but it is unwise to take undue chances in apprehending them."

This passage is essentially a restatement of the duty of care on the part of police officers conducting a pursuit, a duty which we have previously recognized.

As the New York Court of Appeals stated in *Stanton*:

"While it is most unfortunate that bystanders are sometimes innocently involved and injured by the police in the performance of their duties, such emotional and understandable human considerations are not a substitute for proof of negligence." (26 N.Y.2d 990, 991, 311 N.Y.S.2d 28, 29, 259 N.E.2d 494, 495.)

Such proof is lacking in the instant case. Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

STROUSE and UNVERZAGT, JJ., concur.