No. 2--02--0905

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

RONALD SUWANSKI, Indiv. ) Appeal from the Circuit Court

and as Special Adm'r ) of Du Page County.

of the Estate of Beverly L. )

Suwanski, Deceased, ) 

) 

Plaintiff-Appellant, )

)

v.                 )  No. 99--L--1075

     )

THE VILLAGE OF LOMBARD and )

BRUCE BRADFORD, ) 

) 

Defendants-Appellees ) 

)

(Dewey Pierotti, Public  )

Guardian of Du Page County,     )

as Special Adm'r of             )

the Estate of Birute Eidukonis, )  Honorable

Deceased, and Maria Bay,        )  Kenneth Moy,

Defendants).                    )  Judge, Presiding.

_________________________________________________________________

JUSTICE KAPALA delivered the opinion of the court:

Plaintiff, Ronald Suwanski, individually and as the special administrator of the estate of Beverly L. Suwanski, appeals from an order of the circuit court of Du Page County granting summary judgment to defendants, the Village of Lombard and Bruce Bradford on the first two counts of plaintiff's third amended complaint based on the willful and wanton conduct of Bradford.  For the following reasons, we reverse and remand.

FACTS

In this case, two people lost their lives in a high-speed vehicular police pursuit.  While we must resolve the issues presented by the circumstances of this appeal, the legal and social conundrum created by such police pursuits will unfortunately persist beyond our disposition.

The following facts are taken from the various depositions in this case.  On October 10, 1999, at about 9:35 p.m., defendant, Officer Bruce Bradford of the Lombard police department, received a radio report of an automobile driving with an unsecured load on Finley Road in Lombard.  Officer Bradford was proceeding southbound in his marked patrol car when he observed a vehicle driving northbound on Finley Road.  The vehicle appeared to be driving below the speed limit and had debris on both its hood and roof.  The material on the hood partially obstructed the windshield.  According to Officer Bradford, the vehicle had so much junk piled on it that it looked "ridiculous."  The junk was "teetering and tottering."  Officer Bradford believed the vehicle was unsafe to be driven in that condition.

Officer Bradford decided to stop the vehicle because it had an unsecured load and an obstructed windshield.  To that end, he activated his emergency lights and pulled behind the vehicle.  After Officer Bradford activated his lights, the vehicle slowed down as it approached a stop sign at Maple Avenue.  Instead of stopping, however, the vehicle drove through the stop sign.  At that point, the vehicle also began to weave within its lane.

The vehicle then turned west onto Crescent Avenue into the Village of Glen Ellyn.  At that point, the vehicle was traveling 50 miles per hour in a 35-mile-per-hour speed zone.  Debris fell from the vehicle as it wove and crossed the center lane.  Officer Bradford radioed the dispatcher and reported that the vehicle was "weaving and leaving stuff all over the road."  While still on Crescent Avenue, the dispatcher advised Officer Bradford that the vehicle was reported stolen.

It was while on Crescent Avenue that Officer Bradford began to suspect that the driver of the vehicle was driving while under the influence of alcohol.  According to Officer Bradford, the circumstances that led him to that suspicion were the debris on the vehicle, its driving below the speed limit, its driving over the speed limit, and its crossing a double centerline.

The vehicle then turned north onto Forest Avenue and drove through downtown Glen Ellyn.  The vehicle turned west onto Pennsylvania Avenue then north onto Western Avenue.  The vehicle was traveling at 60 miles per hour on Western Avenue.  Up to that point, the vehicle had not stopped at any stop signs along its route.

Officer Bradford followed the vehicle east onto Elm Street.  A witness testified that there was no other traffic on Elm Street, and he estimated the speed of the two vehicles to be about 40 to 45 miles per hour.  According to the witness, Officer Bradford's vehicle was within two to three car lengths of the pursued vehicle.

According to this witness, the light at Elm Street and Main Street was red and both vehicles went through it.  In doing so, they caused two other vehicles to "panic stop" to avoid a collision.  Officer Bradford testified he did not remember what color the light was or seeing the two vehicles attempt to avoid a collision.

As Officer Bradford's vehicle and the other vehicle turned north onto Main Street from Elm, Officer Bradford activated his siren.  While Officer Bradford chased the vehicle on Main Street, the dispatcher confirmed that the other vehicle was stolen.

Officer Bradford testified that while on Main Street the pursuit reached a speed of 90 miles per hour.  Officer Maria Hernandez of the Glen Ellyn police department joined in the pursuit northbound on Main Street.  According to Officer Bradford, as the vehicles approached the intersection with North Avenue, the pursued vehicle slowed down as though the driver might exit the car.  The transcript of Officer Bradford's radio transmission at that point states that the driver "is going to bail."  Instead, the vehicle proceeded through the intersection, still northbound on Main Street, then performed a U-turn, proceeded back southbound on Main Street, then turned west onto North Avenue. 

Another witness, Fatima Ali, was driving southbound on Main Street approaching the intersection with North Avenue.  As she drove into the left turn lane to turn left onto North Avenue, the light for southbound Main Street was red.  At that point, she observed the pursuit proceeding north on Main Street approaching North Avenue.  She described the vehicles as traveling at a speed likely over the 40-mile-per-hour limit.  There were two squad cars chasing another vehicle and they were "going back and forth trying to keep hold of [the vehicle] as [it] was trying to get away from them."  According to Ms. Ali, the squad cars were a "couple of feet" behind the other vehicle.

Ms. Ali thought the chase would continue north but instead the car being chased abruptly turned in front of her, coming within three feet of the front of her vehicle.  She jerked her car to the left to avoid a collision, crossed the oncoming lanes of traffic, and crashed into a road construction sign on the other side of the street.  Officer Bradford testified that he did not recall the near collision with Ali's vehicle.

The chase then continued westbound on North Avenue.  North Avenue at that point is a six-lane roadway with a speed limit of 45 miles per hour.  The traffic on North Avenue was very sparse that evening according to Officer Bradford.  While on North Avenue, Officer Hernandez terminated the pursuit because she was ordered to do so by her supervisor.

Another witness, August Marazzo, was stopped at the intersection of Bloomingdale Road and North Avenue when he observed the pursuit go by on North Avenue.  He estimated the speed of Officer Bradford's vehicle and the other vehicle to be 70 to 80 miles per hour.  According to Officer Bradford, his vehicle periodically reached the speed of 100 miles per hour on North Avenue.  He estimated the closest he got to the pursued vehicle on North Avenue was perhaps a block.

Timothy Troutman also witnessed the chase on North Avenue.  Troutman was driving with his wife westbound in the center lane of North Avenue.  The two vehicles passed his vehicle, moving from the left lane to the right lane.  He estimated the police vehicle was about 15 to 20 feet behind the other vehicle.  As the two vehicles approached the intersection with President Street, Troutman observed the light for westbound North Avenue was red, and he told his wife "somebody is going to get hit."  A few seconds later, he saw a red Chevrolet Beretta pull into the intersection on President Street and get hit by the chased vehicle.  The police car had to take evasive maneuvers to avoid striking either of the two cars.  An accident reconstructionist estimated the speed of the vehicle being pursued to be between 80 and 86 miles per hour at the time it first applied its brakes prior to the collision.

Beverly Suwanski was the driver and sole occupant of the Beretta.  Her husband, Ronald Suwanski, was following behind her in another vehicle.  They were heading home after attending a social event at the home of an acquaintance.  Beverly died of massive injuries suffered in the collision.  The driver of the pursued vehicle, Birute Eidukonis, also died of injuries inflicted as a result of the collision.

The weather conditions during the pursuit were clear, and the roadway was dry.  The area through which the chase occurred was suburban with a mix of residential and commercial properties.  The pursuit lasted 8 minutes and 35 seconds and covered about 6.5 miles.

Officer Bradford testified he first suspected Eidukonis was driving under the influence after she turned onto Crescent Avenue from Finley Road.  Officer Bradford never advised his dispatcher during the pursuit that he suspected the vehicle's driver of being under the influence.  When two different officers at the accident scene asked Officer Bradford what caused the collision, he did not mention to either of them his suspicion that the driver was driving under the influence.  Officer Bradford did inform Lieutenant Watkins of the Lombard police department at the scene that Eidukonis was driving erratically and that he believed it was because she was driving under the influence.

When Detective Randy Logan of the Glendale Heights police department spoke with Officer Bradford's supervisor, Jeff Jordan, the next day about the pursuit, Logan was not told that Officer Bradford suspected Eidukonis of driving under the influence.  When Logan met with Officer Bradford three days later, Officer Bradford stated that he believed Eidukonis was driving under the influence based on her use of a left turn signal when she turned right during the pursuit.  Later, when Detective Logan received Officer Bradford's written report, it indicated Eidukonis was weaving outside her lane and suggested that this was an additional reason for his suspicion that Eidukonis was driving under the influence.

Further, Timothy Troutman stated in his deposition that a week or two after the incident he overheard two people talking about the pursuit at church.  When Troutman stopped to discuss the situation, one of the two identified himself as the Lombard police chief.  According to Troutman, the chief asked Troutman if he knew the woman being chased was intoxicated.  When Troutman responded by asking if Officer Bradford knew the woman was drunk, the chief answered "no."

The Lombard police department had a written policy governing police pursuits in effect at the time of the chase.  The policy called for an officer to weigh the benefits of apprehending an offender against the risk of death or injury to the officer or another by pursuing.  The policy also provided that a pursuit must be terminated whenever the risks to the safety of others outweigh the danger to the community if the suspect is not apprehended.  An officer is also required to terminate a pursuit if ordered to do so by a supervisor.

Officer Bradford's supervisor, Jordan, monitored the entire pursuit via radio.  Jordan was also aware of the weather and road conditions, the day of the week, the time of day, and the general traffic conditions.  He learned from Bradford via the radio that the vehicle was weaving, leaving debris on the road, exceeding speed limits, going through stop signs, and was stolen.  According to Jordan, based on this information, he decided not to order termination of the pursuit because he believed the driver was under the influence and a fleeing felon.  Jordan conceded he would have ordered termination of the pursuit had he known of the near collision with the Ali vehicle at Main Street and North Avenue.

Plaintiff retained as an expert witness Professor Geoffrey Alpert.  Professor Alpert has engaged in numerous studies and published several articles concerning police pursuits.  According to Professor Alpert, Officer Bradford should have terminated the pursuit after 1½ miles.  Professor Alpert opined that Officer Bradford violated the Lombard policy because the risk to the public safety was so high and the need to apprehend so low.  He based his opinion on such factors as the length and duration of the chase, the increasing speeds involved, the near collision at Main Street and Elm, the actual crash involving the Ali vehicle at Main Street and North Avenue, the concession by Jordan that he would have ordered termination if he had known of the actual crash, and the fact that Officer Hernandez was ordered to terminate shortly after the crash at Main Street and North Avenue.  He further opined that Officer Bradford acted with conscious disregard for public safety by continuing the pursuit in the face of incredible and increasingly dangerous risks.  He also considered Officer Bradford's testimony that he would have continued the pursuit even if he had lacked knowledge that the driver
 
was under the influence or that the vehicle was stolen.  Lastly, he opined that had Officer Bradford terminated the chase, the fatal collision likely would not have occurred.  He based this opinion on research that shows that fleeing suspects usually slow down when not being chased.

Defendants' expert, Thomas Walton, the deputy chief of patrol for the Chicago police department, opined that Officer Bradford properly pursued the vehicle and would have been remiss in his duties had he terminated the pursuit.  He premised his opinion on the reckless manner in which the vehicle was driven, the felony auto theft, and the possibility the driver was under the influence.

Officer Bradford and the Village of Lombard moved for summary judgment on the first two counts of the third amended complaint directed against them, contending that they were entitled to summary judgment based on both the issue of proximate cause and the issue of whether Officer Bradford acted willfully and wantonly in pursuing the vehicle.  The trial court granted summary judgment on both grounds and included language under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) allowing plaintiff to appeal.  Plaintiff filed a timely notice of appeal.

DISCUSSION

In cases involving motions for summary judgment, we conduct 
de
 
novo
 review of the evidence in the record.  
Happel v. Wal-Mart
 
Stores, Inc.
, 199 Ill. 2d 179, 185 (2002).  The purpose of a summary judgment proceeding is not to try an issue of fact, but to determine whether any genuine issue of material fact exists.  
Happel
, 199 Ill. 2d at 186.  It is a drastic means of disposing of litigation and therefore should be granted only when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  
Happel
, 199 Ill. 2d at 186.  For purposes of summary judgment, we construe the facts strictly against the moving party and in the light most favorable to the nonmoving party.  
Happel
, 199 Ill. 2d at 186.  In this case, we apply these summary judgment standards to both the proximate cause issue and the willful and wanton issue.

1. Proximate Cause

The issue of the existence of proximate cause is ordinarily determined by the trier of fact.  
Harrison v. Harden County Community Unit School District No. 1
, 197 Ill. 2d 466, 476 (2001)(Harrison, J., specially concurring).  However, where the facts are undisputed and reasonable people would not differ as to the inferences to be drawn from the facts, proximate cause may be determined as a matter of law.  
Harrison
, 197 Ill. 2d at 476.  

Proximate cause encompasses both cause in fact and legal cause.  
Harrison
, 197 Ill. 2d at 476.  The key inquiry into cause in fact is whether a defendant's conduct was a material element and a substantial factor in bringing about the injury.  
Harrison
, 197 Ill. 2d at 476.  Where reasonable minds could differ as to whether a defendant's conduct was a substantial factor in bringing about a plaintiff's injury, there is a question for the jury to decide.  
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 455 (1992).

Legal cause presents a question of foreseeability; a negligent act is a legal proximate cause of an injury if the injury is of the type that a reasonable person would foresee as a likely result of his conduct.  
Harrison
, 197 Ill. 2d at 476-77.  If cause in fact is established, the next question is whether the defendant should be held legally responsible for it.  
Harrison
, 197 Ill. 2d at 477.  The test to be applied in all legal proximate cause determinations involving more than one wrongdoer is whether the first wrongdoer reasonably might have anticipated the intervening cause as a natural and probable result of the first party's own act or omission.  
Harrison
, 197 Ill. 2d at 477.  Additionally, where injury is caused by the concurrent negligence of two persons and the accident would not have occurred without the negligence of both, the negligence of each is a proximate cause of the injury.  
Obert v. Saville
, 253 Ill. App.3d 677, 683 (1993).  It follows, therefore, that there may be more than one legal proximate cause of a plaintiff's injuries.  
Obert
, 253 Ill. App. 3d at 683.

As to factual causation, under the particular facts of the present case, there can be little doubt that reasonable minds could differ as to whether Officer Bradford's pursuing the Eidukonis vehicle in the manner he did was a material element and a substantial factor in bringing about the collision with the Suwanski vehicle and, consequently, the death of Beverly Suwanski.  A police pursuit is unique in the sense that it can occur only if two vehicles are involved, the car that is fleeing and the car that is chasing.  It is essentially symbiotic; both vehicles are necessary to have a chase.  Thus, from the standpoint of causation in fact, it is difficult, if not impossible, under the facts of this case, to separate the two in terms of causation.  Of course, a jury may very well conclude that both drivers were the proximate cause of the harm.  See 
Obert
, 253 Ill. App. 3d at 683.

As for legal causation, a jury could also find under these facts that it was reasonably foreseeable that chasing the Eidukonis vehicle at high rates of speed through residential and commercial suburban streets, knowing she was running stop signs and red lights, would result in injury to some third person.  Officer Bradford could be found to have reasonably anticipated that  Eidukonis's conduct and the resulting collision were the natural and probable result of his own conduct in chasing her vehicle under these particular conditions.

Because we cannot say as a matter of law that no reasonable jury could find Officer Bradford's conduct to be a proximate cause of the death of Beverly Suwanski, we reverse the order granting summary judgment on that basis.  In doing so, we note an earlier decision of this court holding that, under the proper circumstances, "[a]n officer who finds it necessary to pursue a suspect in order to apprehend him could be chargeable with knowledge that it was probable that the suspect would act in a negligent or even illegal manner" and that the officer's conduct could be found to be a proximate cause of the plaintiff's injury.  
Sundin v. Hughes
, 107 Ill. App. 2d 195, 203 (1969).  We also acknowledge, but find distinguishable, this court's more recent decision in which we held that as a matter of law an officer could not be a proximate cause of injury to a party who was an occupant of the vehicle being pursued and was also an active participant in the flight.  See 
Kimber v. City of Warrenville
, 248 Ill. App. 3d 361, 370 (1993).  As the court emphasized in that case, in a situation where "an innocent third party [is] injured during a police chase" it "may be determined that the police are one of the proximate causes of the injury."  
Kimber
, 248 Ill. App. 3d at 370.  We have just such a situation in this case.

2. Willful and Wanton Conduct

The Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."  745 ILCS 10/2--202 (West 1998).  The Tort Immunity Act further defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1--210 (West 1998).  Whether conduct is willful and wanton is ultimately a question of fact for the jury.  
Doe v. Calumet City
, 161 Ill. 2d 374, 390 (1994).

We hold that under the specific facts of this case, plaintiff has presented a jury question sufficient to preclude summary judgment on the issue of whether Officer Bradford engaged in willful and wanton conduct in pursuing the Eidukonis vehicle.  We begin our analysis by observing that in the context of police pursuits there exists a wide array of factual possibilities which create a range of conduct that will fall somewhere on the spectrum of liability.  Some situations will be so benign as to clearly be, as a matter of law, below the theoretical minimum for willful and wanton conduct.  Those cases should, of course, be disposed of by summary judgment.  There may also be some cases where the circumstances are so egregious that one could say, as a matter of law, that the officer acted willfully and wantonly.  The third possibility is those circumstances where the question of willful and wanton conduct is the subject of reasonable argument.  It is those cases that cannot be decided as a matter of law and must be put to the jury.  We find this case to fall in this last range.

There are undisputed facts in this case that would support a finding of no willful and wanton conduct.  Those facts include the clear weather and dry roads, the time of day, the day of the week, the light traffic conditions, and the facts that the driver of the vehicle was committing a Class 2 felony, the vehicle was weaving, and the pursued vehicle was, at least for some of the distance, dropping debris onto the roadway.

On the other hand, there are also undisputed facts that clearly support a finding of willful and wanton conduct.  Those include the nature of the area, namely, suburban, residential, and commercial, the length of the pursuit being 6.5 miles, the duration of the pursuit being over 8 minutes, and the facts that the pursued vehicle was running stop signs and red lights, there was a near collision and an actual collision related to the pursuit, the speeds increased as the chase progressed and reached 100 miles per hour, the fact that the vehicle was no longer dropping debris onto the roadway, and the fact the driver was suspected only of a nonviolent, property-based felony.

Of course, there are also facts that could be interpreted both ways, such as the degree to which Officer Bradford complied with the pursuit policy.  Additionally, the two experts offered diverse opinions in regard to the willful and wanton issue.  Plaintiff's expert, on the one hand, opined that Officer Bradford was acting willfully and wantonly once he pursued the vehicle beyond 1½ miles.  On the other hand, defendants' expert testified he considered Officer Bradford's conduct in pursuing the vehicle to be appropriate.  When viewed in a light most favorable to plaintiff, these facts also support denial of summary judgment on the issue of willful and wanton conduct.

As for the issue of whether Officer Bradford pursued the vehicle because he suspected the driver to be driving under the influence, to the extent such a matter is material, there exists a question of fact in that regard.  While Officer Bradford testified he believed Eidukonis was driving under the influence and his final report supports that fact, other evidence calls that conclusion into question.  For example, the fact Officer Bradford never mentioned that suspicion to the dispatcher during the pursuit, the fact he never told it to the two officers initially at the scene, and the fact that his stated bases for his suspicion evolved over time all create a question of material fact as to whether Officer Bradford did in fact pursue the vehicle in part because he suspected the driver was under the influence.

It is precisely because the state of the facts in this case does not dictate, as a matter of law, a conclusion as to whether Officer Bradford acted willfully and wantonly in pursuing the Eidukonis vehicle that we reverse the grant of summary judgment in that regard.  We cannot say as a matter of law that no reasonable jury could find that Officer Bradford acted willfully and wantonly under the particular facts of this case.

In reaching this decision, we recognize that several decisions of the Illinois Appellate Court have affirmed summary judgment in favor of the police in police pursuit cases involving injuries to innocent third parties.  See, 
e.g.
, 
Hall v. Village of Bartonville Police Department
, 298 Ill. App. 3d 569 (1998); 
Laco v. City of Chicago
, 154 Ill. App. 3d 498 (1987); 
Breck v. Cortez
, 141 Ill. App. 3d 351 (1986).  We take no issue with those cases, but merely find the unique facts of this case to be distinguishable from those prior cases.

The facts in 
Hall
 are different from those here because the location of the chase was "not a densely populated urban area" and the "duration of the chase was relatively brief."  
Hall
, 298 Ill. App. 3d at 573.  In 
Laco
, the squad car's maximum speed was between 40 and 45 miles per hour and the chase covered only about six city blocks.  
Laco
, 154 Ill. App. 3d at 502.  In 
Breck
, the chase took place in an unincorporated area where there were no businesses or residences and the police were traveling only 5 to 10 miles over the speed limit at the time of the collision.  
Breck
, 141 Ill. App. 3d at 360.  These fact situations differ sufficiently from the present case to permit a different result here.

We are not unsympathetic to the plight of police officers thrust into Officer Bradford's situation.  In discharging his duties he was forced to make hurried decisions under grave and stressful circumstances.  We believe the correct manner to resolve this dilemma is through legislation rather than judicial fiat.  If we were to conclude under the facts of this case that no jury could find that Officer Bradford's actions constituted willful and wanton conduct, we would be judicially granting immunity when the legislature has specifically declined to do so.  Any amendment of the Tort Immunity Act in this regard must be left to the legislature.

While we agree that police officers should be able to perform their duties as free as possible from liability concerns, there must be some reasonable limit to their exercise of discretion.  The role of the jury in this case will be to consider the evidence and decide whether Officer Bradford's actions showed an utter indifference to or conscious disregard for the safety of others or their property.  We do not believe that allowing a jury to make that assessment will disrupt effective policing.

In closing, we emphasize that this case should not be read as an open invitation to file suit against the police for injuries arising out of police pursuits.  Nor should it be interpreted as discouraging the police from pursuing suspected lawbreakers.  There are many factual situations that will allow the police to conduct a pursuit that will not fall within the realm of willful and wanton conduct.  As we have noted repeatedly, we decide this case on the particular facts before us.  We further offer no opinion as to whether the evidence here does in fact support a conclusion that this pursuit was the proximate cause of plaintiff's harm or that Officer Bradford acted willfully and wantonly.  Those are matters entirely for a jury to decide.

CONCLUSION

For the foregoing reasons, we reverse the order of the circuit court of Du Page County granting summary judgment in favor of the Village of Lombard and Officer Bradford and remand for further proceedings.

Reversed and remanded.

McLAREN, J., concurs.

     JUSTICE O'MALLEY, dissenting:

It is an unfortunate but unavoidable aspect of police work that, by taking action to protect people and property, often other people and other property are put at risk.  Consequently, police officers are called upon to delicately balance the benefit versus the risk of a possible course of action, frequently under urgent circumstances.  A police officer who undertakes such a decision with the good intention of protecting the public ought not to be held liable for his honest miscalculation.  The Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) recognizes this by providing that a police officer acting to enforce a law may be held liable only for "willful and wanton conduct."  745 ILCS 10/2--202 (West 2000).  Moreover, "willful and wanton conduct" is defined in the Tort Immunity Act with reference to the police officer's state of mind:  "[A] course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an 
utter indifference
 to or 
conscious disregard
 for the safety of others or their property." (Emphasis added.)  745 ILCS 10/1--210 (West 2000).  Although they are stated in the disjunctive, my view is that the juxtaposition of "deliberate intention" with "utter indifference" and "conscious disregard" in the statute indicates that "utter indifference" and "conscious disregard" refer to conduct that is far closer to intentional than negligent, 
i.e.
, outrageous conduct.  In any case, I see no evidence that Officer Bradford acted with the state of mind of either "utter indifference" or "conscious disregard" for the safety of others or their property.  Significantly, the whole point behind chasing the suspect was to protect others and their property.

Although it is true that whether conduct is "willful and wanton" is generally a factual question, Illinois courts have never until today held there to be a factual question as to whether a police chase constituted willful and wanton conduct.  Two considerations weigh against holding a police officer personally liable for chasing a suspect in the course of his duty.

The first is that by discouraging police from chasing suspects, we thereby encourage criminals to flee.  
Hall v.  Village of Bartonville Police Department
, 298 Ill. App. 3d 569, 573 (1998); 
Laco v. City of Chicago
, 154 Ill. App. 3d 498, 506 (1987).  Obviously, fleeing becomes a more attractive option where a criminal, cognizant of the fact he will not be chased, believes that he will avoid capture.  In fact, the more serious the crime the criminal has committed, the greater utility in his flight because he avoids a greater punishment by his escape.  Moreover, under the majority's reasoning it appears that the best way to thwart a police chase is to drive particularly fast and especially recklessly.  To the extent that we have decided this case in a manner that creates an incentive to flee, we have only frustrated law enforcement and endangered more people. 

Second, as recognized by the Tort Immunity Act, law enforcement can be optimally effective only where police make their decisions without fear of personal liability, at least for conduct that is not outrageous
.  Police officers must take actions that necessarily create a risk to some people in order to remove a greater danger to other people.  For example, any police chase or, for that matter, a police officer speeding to the scene of a home invasion has the potential to cause injury to people not otherwise at risk.  In deciding how to respond to a threat, police weigh the benefit versus the risk of possible courses of action.  Where fear of personal liability becomes a consideration, we skew this calculation and discourage police officers from undertaking optimal but nevertheless somewhat risky courses of action.  Pointedly, fear of their own death is enough for police officers to contend with when they decide whether to embark on a course of action; they should not have to worry about losing house and home in a lawsuit because a court later decides that a more conservative course of action would have been more appropriate.

Although there are a myriad of actions a police officer might take to enforce the law, I find it helpful to divide them into two broad categories for the purpose of analyzing this situation.  The first category involves dangerous actions that pose little or no risk to the police officer but potentially great risk to others, 
e.g.
, shooting at a fleeing suspect in a populated area.  The other category involves actions that place the officer in at least as great a risk as innocent bystanders, 
e.g.
, chasing a fleeing suspect.  Chasing a suspect undoubtedly places innocent bystanders at risk, but nonetheless a cruel twist of fate is still required to place any particular bystander directly in harm's way.  The officer (and the fleeing suspect), however, are in imminent danger at all times during the chase.  Consequently, fate plays a much diminished role with regard to the officer's safety.  Saying that Officer Bradford acted with conscious disregard for the safety of others, we certainly also have to say that he acted with even greater conscious disregard for his own safety.  There is nothing in the evidence that suggests that Officer Bradford's motive for putting his life at risk was anything other than the obvious one, to protect the safety of others and their property.  In the ordinary circumstance a police officer or any person risking his life to protect others would be hailed as a hero.  Is such a person a wanton villain under the Tort Immunity Act where fate intervenes and a bystander is killed?  To my way of thinking there is not so thin a line between a hero and a villain.

The whole point behind the Tort Immunity Act is that police will not be liable for their honest judgment calls, at least where they are not outrageous.  Under the statute, a police officer may be liable only where his conduct shows "utter indifference" or "conscious disregard" for the safety of others and their property.  745 ILCS 10/1--210 (West 2000).  When a police officer undertakes a course of action with the purpose of protecting the safety of others or their property, it is extraordinary to say that he has shown "utter indifference" or "conscious disregard" for the safety of others and their property simply because, in our judgment, another course of action or even no action would have been more prudent.  A police officer who makes such a judgment call, even if errant, has acted with specific regard for the safety of others, not conscious disregard.

Officer Bradford made a judgment call in the course of his duty.  Whether the decisions to give and continue chase were correct at the time that they were made is not relevant here.  The point is that the evidence shows that Officer Bradford, in his judgment, thought that they were the right decisions, so much so, in fact, that he put his own life in danger by pursuing this suspect.  Officer Bradford's decisions turned out tragically.  Officer Bradford, however, made his decisions in the course of attempting to protect others and their property.  The Tort Immunity Act is designed to insulate police officers from liability for exactly this type of honest mistake.  I see no evidence that Officer Bradford acted with "conscious disregard" or "utter indifference" to the safety of others or their property.  As a result, his conduct could not have been "willful and wanton" as it is defined in the Tort Immunity Act.  I believe that the trial court judgment should be affirmed.