FIRST DIVISION
NOVEMBER 05, 2007

No. 1-06-3433

| | | |
|---|---|---|
| PIERRE SHUTTLESWORTH and<br>RAINA CANNON, | ) | Appeal from the<br>Circuit Court of<br>Cook County. |
| Plaintiffs-Appellants, | ) | |
| v. | ) | |
| THE CITY OF CHICAGO, a Municipal Corporation, | ) | No. 02 L 14697 |
| Defendant-Appellee | ) | |
| (Koman Willis and Kandia Gray, | ) | Honorable<br>Randye A. Kogan,<br>Judge Presiding. |
| Defendants). | ) | |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiffs, Pierre Shuttlesworth and Raina Cannon, filed this action seeking recovery against defendants, The City of Chicago, Koman Willis, and Kandia Gray, for injuries caused by the collision of the automobile they were occupying and an automobile that was attempting to elude police. Gray was the owner of the fleeing automobile, but Willis was the driver on the night of the collision. Count II of plaintiffs' amended complaint alleged willful and wanton conduct on the part of Chicago police officers John Foertsch and Columbus Ingram and their employer, the City of Chicago (the City), in engaging in a pursuit of Willis shortly before the collision occurred. The City filed a jury demand and the trial court granted summary judgment in favor of the City. Plaintiffs appeal.

BACKGROUND

The relevant facts are as follows. Chicago police officers John Foertsch and Columbus Ingram were working in a marked police vehicle on the south side of Chicago on November 2, 2002, at around 6:30 p.m., when they noticed a dark blue or black Chevrolet Monte Carlo heading south on Indiana Avenue. Ingram, who was driving the police vehicle, observed that neither the driver nor the passenger of the Monte Carlo was wearing a seatbelt. The officers began to follow the vehicle. The officers used a computer in the police vehicle to check the license plate number on the Monte Carlo, which, according to the records of the Illinois Secretary of State, did not belong to a Monte Carlo but a Chevrolet Malibu.

The officers decided to "curb" the vehicle to investigate further. As they continued to drive south on Indiana Avenue, approaching 69th Street, the officers activated their Mars lights and used a hand held spotlight to signal the driver to stop. The vehicle slowed to about 10 to 15 miles per hour, turned right onto 69th Street, and finally stopped at 164 East 69th Street. Officer Foertsch, who was in the passenger seat, exited the police vehicle and approached the Monte Carlo. Officer Foertsch pulled his radio communicator to contact the police dispatcher about the stop, but Willis, who was driving the Monte Carlo, placed the vehicle in reverse and accelerated in the direction of the officer before he could do so. Officer Foertsch jumped out of the way and landed on the sidewalk. Willis then placed the Monte Carlo in drive and sped away.

Officer Foertsch stood and returned to the police vehicle, with the cord of his radio communicator wrapped around his leg. The officers claimed in their deposition testimony that they pursued the Monte Carlo down 69th street for about 30 to 40 seconds. Officer Foertsch

2

stated that he did not communicate with police headquarters at that time because his communicator was wrapped around his leg and he was assisting his partner to navigate the pursuit. Officer Foertsch stated that the police vehicle's Mars lights and sirens were activated. He also stated that there was "very little traffic." He observed two or three westbound autos and a few eastbound vehicles stopped at the traffic light on Normal Avenue. He stated that the Monte Carlo was driving westbound in the eastbound lane at one point during the pursuit.

Officer Ingram described 69th Street as a residential roadway with a speed limit of 25 miles per hour. He recalled oncoming headlights in the eastbound lane but could not recall the amount of traffic. He stated that as he and his partner began the pursuit, he observed the Monte Carlo about three blocks away speed westbound on 69th Street over the expressway. Ingram recalled that he drove the police vehicle at the speed limit for the first few blocks and accelerated to about 40 to 50 miles per hour as the Monte Carlo drove over the expressway. He said that he was able to observe the taillights of the Monte Carlo about four to six blocks ahead of the police vehicle and stated that the Monte Carlo was moving from side to side between westbound and eastbound lanes at a speed of about 80 miles per hour. He stated that he did not communicate to police headquarters because he had observed Foertsch with his communicator at his mouth and thought that his partner had already communicated the traffic stop.

Officer Ingram further testified at this deposition that he deactivated the Mars lights and siren when he lost sight of the Monte Carlo as he drove the police vehicle under a viaduct near Wentworth Avenue. He stated that he then slowed the police vehicle back down to the speed limit. A few seconds later, he observed a "flicker and smoke" about six blocks away, but he was

3

not close enough to observe an impact.

Officer Foertsch said that he did not lose sight of the vehicle but agreed to terminate the pursuit for several reasons; he stated that the Monte Carlo was being driven recklessly; they were too far away from the fleeing vehicle; and they were no longer in their police district. After they stopped the pursuit, Officer Foertsch tried to retrieve the license plate information from the computer in the vehicle so that he could include the number in a radio communication to the City's office of emergency communications (OEC). He then observed the Monte Carlo, which was six blocks away, attempt to swerve out of the way of a vehicle making a left turn from Normal Avenue into 69th Street, heading east. The Monte Carlo swerved left in the intersection, hit the automobile that was occupied by the plaintiffs, hit a light pole, and ignited into flames. Officer Foertsch did not report the pursuit to the OEC at that time.

As the officers drove up to the scene of the collision, they saw Willis and Giovanni Turnipseed, the passenger, climb out of the window of the Monte Carlo and run. The officers stopped the police vehicle and chased the occupants on foot until they were apprehended.

At her deposition, Cannon stated that she was driving home with Shuttlesworth in the passenger seat, just before the collision. She was heading east on 69th Street and stopped at the traffic light on Normal Avenue. She waited at the traffic light when she observed a blue and white marked police vehicle about two blocks away heading toward her, moving "real, real fast." She could not recall if the Mars lights of the police vehicle were activated but recalled that she could not hear a siren. She did not see any other vehicles moving in the vicinity of the police vehicle. Then, the auto driven by Willis, which Cannon never observed before the moment of impact,

4

collided with hers.

Officer Youvandia Smith testified that she and her partner were about a half block away, on Normal Avenue, when the collision occurred. They had stopped a vehicle for a traffic violation and were outside their vehicle when Officer Smith heard tires screeching. She continued with the traffic stop, checked the motorist's license, and was returning the license when they received the call about the collision. She and her partner responded and she prepared the police reports relating to the collision.

Sergeant Ken Sahnas, the supervisor of drivers' training at the Chicago Police Academy, testified during his deposition concerning police pursuit training provided at the academy and about the contents of department general orders on the subject. The version of General Order 97-3, Motor Vehicle Pursuits, in effect at the time of the accident provided that "[t]he decision to initiate pursuit rests with the individual officer" and should only occur when: emergency sirens and lights are on; the pursued vehicle does not stop; the OEC is notified over the radio; the need for immediate apprehension outweighs the danger created by pursuit; the officer is able to maintain control of the vehicle and will not create unwarranted danger; and the volume of traffic and road conditions would permit the pursuit. The general order further requires the officer initiating pursuit to "immediately notify the OEC that a pursuit is in progress" and provide information about the pursuit. The general order requires officers and their supervisors to continuously reevaluate whether pursuit should continue and provides that a pursuit should be immediately terminated in various circumstances, including when communication with the OEC is lost; the pursuit becomes too dangerous; or a supervisor orders the pursuit terminated.

Sergeant Sahnas explained that under the policy, each case requires an assessment of whether the need for immediate apprehension outweighs the inherent danger of pursuit. Notification to the OEC is necessary in case assistance is needed and so that the pursuit can be supervised. He stated that it may be necessary for an officer to delay calling in the pursuit, for up to a minute, in order to concentrate on a perceived threat, observe what the person being pursued is doing, and gather information that needs to be communicated to the OEC.

The City filed a motion labeled "Motion to Dismiss," arguing that the City is immune from negligence under sections 2-202 and 2-109 of the Tort Immunity Act (745 ILCS 10/2-109, 2-202 (2004)), claiming the officers were executing or enforcing the law local Governmental and Governmental Employees and the officers had not engaged in willful and wanton conduct. The City also argued that the police officers' conduct was not the proximate cause of the injuries.

The body of the motion requested dismissal pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2004)); however, the conclusion of the motion requested that summary judgment be entered in favor of the City. We will consider the City's motion as a motion for summary judgment under section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2004)). In their response, plaintiffs noted the similarities between the two types of relief and argued that the motion should be denied under either standard.

On October 2, 2006, the trial court entered summary judgment in favor of the City, rejecting the plaintiffs' argument that the evidence showed willful and wanton conduct by the officers during the pursuit. The court also found that the plaintiffs had not shown the officers' conduct was a proximate cause of the injuries because Willis's reckless driving after the pursuit

was terminated broke the chain of causation.

ANALYSIS

Section 2-202 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2004). The Act further provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2004).

Section 1-210 of the Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2004).

There is no dispute here that Officers Foertsch and Ingram were public employees within the meaning of the Act. 745 ILCS 10/1-206, 1-207 (West 2004). Nor is there any dispute that, in pursuing the Monte Carlo, which Willis was driving, Officers Foertsch and Ingram were engaged in the enforcement of the law. It follows, then, that in order to recover from the City, at trial, plaintiffs must prove that the officers' conduct in pursuing the Monte Carlo was willful and wanton. *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087, 1093-94 (1995).

As noted, the City filed a motion for dismissal pursuant to section 2-619 of the Code. The body of the motion requested dismissal pursuant to section 2-619 of the Code; however, the conclusion of the motion requested that summary judgment be entered in the City's favor and

7

against plaintiffs. The trial court entered summary judgment in favor of the City and against plaintiffs. On appeal, the parties treat the trial court's order as one arising from a motion for summary judgment. We, therefore, do the same.

Summary judgment is appropriate whenever the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 228 (2007); *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087, 1094 (1995). The trial court is not to try issues of material fact when considering a motion for summary judgment; its sole function is to determine whether issues of material fact exist. *Urban*, 272 Ill. App. 3d at 1094, citing *Green v. International Insurance Co.*, 238 Ill. App. 3d 929, 933 (1992). The court must strictly construe the record before it against the movant and in favor of the nonmovant, drawing all reasonable inferences in favor of the nonmovant. This court's review of a trial court's grant of summary judgment is *de novo*. *Urban*, 272 Ill. App. 3d at 1094, citing *Wiseman-Hughes Enterprises, Inc. v. Reger*, 248 Ill. App. 3d 854, 857 (1993).

The question of whether an officer's actions amount to willful and wanton misconduct is normally reserved for the trier of fact; in this case, the jury. *Urban*, 272 Ill. App. 3d at 1094, citing *Breck v. Cortez*, 141 Ill. App. 3d 351, 359-60 (1986). However, the question may be resolved by the trial court, on a motion for summary judgment, when all the evidence viewed in the light most favorable to the nonmovant so overwhelmingly favors the movant that no contrary determination based on that evidence could ever stand. *Urban*, 272 Ill. App. 3d at 1094, citing

8

*Breck v. Cortez*, 141 Ill. App. 3d 351, 359-60 (1986). In other words, in order for the defendant to prevail on the motion for summary judgment, the trial court must find that no genuine issue of material fact exists as to whether the officers engaged in willful and wanton conduct. *Urban*, 272 Ill. App. 3d at 1094, citing *Breck v. Cortez*, 141 Ill. App. 3d 351, 359-60 (1986).

Plaintiffs contend that the trial court erred by finding that no genuine issue of material fact existed as to whether the officers engaged in willful and wanton conduct. Specifically, plaintiffs argue that the totality of the circumstances demonstrates that the officers engaged in willful and wanton conduct by: initiating the pursuit, failing to activate emergency equipment, failing to notify superiors of the chase in progress, using excessive speed in the pursuit, and pursuing the Monte Carlo for an unreasonable length and duration. We find plaintiff's arguments unpersuasive. We review the record of this case, as we must for purposes of this appeal, in the light most favorable to plaintiffs to explain our conclusion. *Murray*, 224 Ill. 2d at 228 (explaining that the grant of summary judgment is appropriate only when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law).

As noted, Officer Foertsch stated in his deposition that the entire pursuit lasted 30 to 40 seconds, that there was "very little traffic" during the pursuit, and that the police vehicle's Mars lights and sirens were activated. He stated that he agreed to terminate the pursuit for several reasons, including that the Monte Carlo was being driven recklessly and that the officers were too far away from the fleeing vehicle. He then observed the Monte Carlo's attempt to swerve out of the way of a vehicle making a left turn from Normal into 69th Street, heading east. He stated that

the Monte Carlo swerved left in the intersection, hit the automobile that was occupied by the plaintiffs, hit a light pole, and ignited into flames.

Officer Ingram, who was driving the police vehicle, stated that he was unable to recall the amount of traffic on the roadways, but could remember observing oncoming headlights in the eastbound lane of 69th Street during the pursuit. Ingram recalled that he drove the police vehicle at the speed limit for the first few blocks of the pursuit, and accelerated to about 40 to 50 miles per hour as the Monte Carlo drove over the expressway. Ingram was able to observe the taillights of the Monte Carlo about four to six blocks ahead of the police vehicle and stated that the Monte Carlo moved from side to side between the westbound and eastbound lanes at a speed of about 80 miles per hour. Ingram stated that he deactivated the Mars lights and siren when he lost sight of the Monte Carlo as he drove the police vehicle under a viaduct near Wentworth Avenue.

At her deposition, Cannon stated that she was driving home with Shuttlesworth in the passenger seat, just before the collision. She was heading east on 69th Street and stopped at the traffic light on Normal Avenue. She waited at the traffic light when she observed a blue and white marked police vehicle about two blocks away heading toward her, moving "real, real fast." She could not recall if the Mars lights of the police vehicle were activated but recalled that she could not hear a siren. The vehicle driven by Willis then struck her vehicle, causing injuries to both her and Shuttlesworth.

The factual scenario most favorable to the plaintiffs, when viewing the evidence in the record in the light most favorable to them, is as follows. The pursuit of the Monte Carlo lasted 30 to 40 seconds (we must accept the officers' testimony that the pursuit lasted 30 to 40 seconds, as

10

it stands uncontroverted since plaintiffs have not introduced the testimony of Willis or Turnipseed to controvert the testimony of the officers in this respect). Further, for purposes of this appeal we must assume that the officers never disengaged the pursuit of the Monte Carlo prior to the collision, since Cannon stated that she observed the police vehicle, about two blocks away from her position, moving toward her vehicle, traveling "real, real fast" just prior to the collision. We must assume also that the police vehicle's Mars lights and siren were not activated since Cannon stated that she remembers not hearing the police vehicle's siren and could not recall whether the police vehicle's Mars lights were activated. It is against this factual scenario that we examine whether the officers' actions rose to the level of willful and wanton misconduct. We find that it did not.

First, initiating the pursuit of the Monte Carlo, alone, did not constitute willful and wanton conduct. It is not willful conduct to attempt to apprehend a fleeing offender even for minor traffic violations. *Laco v. City of Chicago*, 154 Ill. App. 3d 498, 506 (1987).

Second, failure to activate emergency equipment, or to notify superiors of a pursuit, does not constitute willful and wanton conduct. "Violation of self-imposed rules or internal guidelines *** 'does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond that, willful and wanton conduct.' [Citation.] *** A police officer cannot be found to have acted willfully and wantonly when he pursues a vehicle driven recklessly as long as the officer does not pursue the vehicle in a reckless fashion." *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 781-82 (2006).

11

Further, there is nothing in the record to create a genuine issue of material fact as to whether the officers pursued the Monte Carlo in a reckless fashion. The undisputed evidence is that the weather was clear, traffic was light, and the roads were dry. Cannon's testimony that the police vehicle was approaching her position at a high speed, alone, does not rise to the level of willful and wanton. See *Nelson v. Thomas*, 282 Ill. App. 3d 818 (1996) (six - nine to block-long chase occurring at end of rush hour, near busy intersection, with wet road conditions did not demonstrate an utter indifference or conscious disregard of the public safety); *Urban*, 272 Ill. App. 3d 1087 (initiating pursuit of an unhelmeted motorcyclist or his passenger during clear and dry conditions in light traffic did not demonstrate an actual or deliberate intention to harm or utter indifference to or a conscious disregard for the safety of the public).

Plaintiffs urge us to follow *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248 (2003), and remand this case to the trial court for further proceedings. In *Suwanski*, the second district of the this court reversed and remanded summary judgment for the Village of Lombard, holding that there was a question of fact whether the officer engaged in willful and wanton conduct where the pursuit lasted over 8 minutes, covered 6 ½ miles, and reached speeds of 100 miles per hours. The police continued the pursuit after one collision between the fleeing suspects and another auto had already occurred. Ultimately, the fleeing vehicle crashed into yet another auto, killing the drivers of both vehicles. That type of factual scenario does not exist here.

In sum, in order for the motion for summary judgment to be denied, the trial court had to find that a genuine issue of material fact existed as to whether the officers acted with an actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety

12

of others. *Breck*, 141 Ill. App. 3d at 360-61. The evidence, in the light most favorable to the plaintiffs failed to establish willful and wanton conduct. Since we find that no willful and wanton conduct existed, we need not decide the issue as to whether the conduct of the officers was a proximate cause of the plaintiffs' injuries.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL, P.J., and WOLFSON, J., concur.