2015 IL App (2d) 141114
No. 2-14-1114
Opinion filed December 24, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| MARY LACEY, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 12-L-179 |
| | ) | |
| JAMES PERRIN and THE CITY OF NORTH | ) | Honorable |
| CHICAGO, | ) | Diane E. Winter and |
| | ) | Thomas M. Schippers, |
| Defendants-Appellees. | ) | Judges, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Mary Lacey, filed a complaint against defendants, James Perrin and the City of North Chicago (City), after Perrin, a police officer for the City, struck a vehicle in which plaintiff was a passenger. The jury returned a general verdict in favor of plaintiff and awarded her $125,016.50. However, the jury also answered in the affirmative two special interrogatories, which asked whether Perrin was in execution and enforcement of the law at the time of the accident and whether Perrin was en route to assist another officer at the time of the accident. The trial court entered judgment in favor of defendants, based on the answers to the special interrogatories. Plaintiff appeals, arguing that: (1) the trial court erred by granting defendants summary judgment on the issue of willful and wanton conduct; (2) the answers to the special

interrogatories should be set aside and she should receive a judgment on the general verdict (judgment notwithstanding the verdict) or, in the alternative, a new trial on the issue of liability or an entirely new trial because the special interrogatories were improperly submitted and the answers are against the manifest weight of the evidence; (3) the trial court erred by denying her leave to file a third amended complaint to add a spoliation-of-evidence count; and (4) the trial court abused its discretion by allowing defendants to introduce evidence of the police department's call log, resulting in an unfair trial. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     The following facts are not in dispute. On April 14, 2011, at approximately 7:27 p.m., at the intersection of McAlister and South Avenues in Waukegan, Perrin's squad car collided with a 2005 Lincoln Town Car in which plaintiff was a passenger. The Town Car was driven by Margo Willis.[1] The accident occurred at dusk, the street lights had not yet come on, traffic was light, and the weather was fair and dry.

¶ 4     On January 8, 2014, plaintiff filed a second amended, four-count complaint alleging that Perrin was liable due to his negligence and willful and wanton conduct and that the City was liable, based on the theory of *respondeat superior*, for Perrin's negligent and willful and wanton conduct. Plaintiff alleged that Perrin had a duty of reasonable care and a duty to refrain from willful and wanton conduct with respect to the operation of his police vehicle. Plaintiff alleged that Perrin breached these duties by accelerating into the intersection, past a stop sign, without first determining that the way was clear and that movement was safe, in violation of various City

---

[1] Initially Willis also filed suit against Perrin but that case was nonsuited. Willis was also a defendant in this case, but she was directed out at the close of the evidence and that finding is not subject to this appeal.

police rules and regulations as well as Illinois statutes, and entering the intersection while looking down and failing to avoid cars already inside the intersection.

¶ 5    On January 23, 2014, defendants filed an answer and affirmative defenses, asserting immunity under, *inter alia*, section 2-202 (providing immunity to public employees for "act[s] or omission[s] in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct") and section 2-109 (providing that a "local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable") of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-109, 2-202 (West 2014)).    Plaintiff filed an answer to defendants' affirmative defenses, denying that said sections of the Tort Immunity Act provided immunity to defendants.

¶ 6    On March 27, 2014, defendants filed a motion for summary judgment, alleging that there were no genuine issues of material fact regarding whether Perrin was acting in his capacity as a police officer at the time of the accident, whether he was responding to an emergency call for assistance in the apprehension of a fleeing suspect, and whether Perrin was in the execution and enforcement of the law at the time of the collision.    Defendants alleged, therefore, that they were immune from liability pursuant to sections 2-202 and 2-109 of the Tort Immunity Act. Defendants attached to their motion the deposition testimony of Perrin, plaintiff, and Willis, Perrin's answers to interrogatories, the call log, and the affidavit of Deputy Police Chief Richard Wilson.

¶ 7    On May 27, 2014, plaintiff filed her response to defendants' motion for summary judgment, alleging the following.    There were genuine issues of material fact, by virtue of Perrin's deposition testimony and a computer assisted operations report of police radio transmissions (CAD report), regarding whether Perrin was responding to an emergency call for

assistance in the apprehension of a fleeing suspect. Therefore, plaintiff denied the affirmative defense that Perrin was in the execution and enforcement of the law at the time of the collision. Further, plaintiff alleged that there were genuine issues of material fact regarding whether Perrin's operation of his squad car rose to the degree of culpability necessary to determine that he exhibited an utter indifference or conscious disregard for the safety of others. Plaintiff incorporated by reference the deposition testimony of plaintiff, Perrin, and Willis. Plaintiff attached her answer to defendants' affirmative defenses, the deposition testimony of Wilson, the CAD report, dated June 18, 2013, and police department rules and regulations 10.9 through 10.13 and 10.19.

¶ 8 On June 11, 2014, defendants filed a reply in support of their motion for summary judgment. Defendants argued that whether the vehicle driven by the fleeing suspect was taken without permission or was stolen had no impact on defendants' entitlement to summary judgment; when he collided with plaintiff, Perrin was not engaged in routine work but rather was attempting to assist City police officer Gary Grayer to apprehend the suspects in an emergency situation.

¶ 9 On June 24, 2014, the trial court granted defendants' motion for summary judgment regarding plaintiff's claims alleging willful and wanton conduct. The trial court stated in its written order that summary judgment was granted on the following issues:

"1) fleeing and eluding is execution and enforcement of the law; and

2) willful and wanton conduct–the Court finding there is no issue of material fact that Perrin's conduct was merely negligent, but not willful and wanton.

The sole issue remaining is whether Perrin was responding to an emergency call, the Court finding a question of fact remains on this issue."

¶ 10     On July 9, 2014, plaintiff filed a motion to file a third amended complaint to add, *inter alia*, a negligent-spoliation-of-evidence count against the City. Plaintiff's motion alleged the following. The City ordinarily keeps original dispatch tapes "for a period of 90 days." Thirty-three days after the accident, plaintiff's counsel "requested that Donna Murphy of Claims One, the duly authorized agent of [the City], preserve 'any radio traffic by [the City] dispatch center … for a period of one hour before to one hour after the collision.' " This request was made "well within the 90 day time frame." On December 6, 2013, plaintiff's counsel sent to the City a request to produce the original police dispatch tapes. "The CD containing the requested dispatch tapes produced by [the City] in response to Plaintiff's Discovery Request were not the originals and are useless because they appear to be edited and are devoid of any indication as to the times that the calls were placed." Plaintiff also alleged that she needed to amend her complaint due to the trial court's ruling that "Perrin was not guilty of willful and wanton misconduct."

¶ 11     Attached to plaintiff's motion was a January 7, 2014, letter in which plaintiff's counsel was advised that the City was unable to produce the original dispatch tapes, because they were destroyed. The letter also stated that "there would be no time stamps on [the City's] original [dispatch] tape." Also attached was the April 29, 2014, deposition of Wilson, in which plaintiff's counsel learned that, if the original dispatch tapes had not been destroyed by the City, the exact times that calls were made would have been ascertainable by listening to the original tapes on the City's equipment

¶ 12     The January 7, 2014, letter provided:

> "It is the practice of North Chicago to automatically erase these recordings after 90 days. *** In this matter, the original recording was copied and saved onto a disc. It is from that disc that copies of the recording were made and produced to you and others in this litigation. It is important to note that we are advised there would be no time stamps on

North Chicago's original 911 tape, and that the copy of the audio that you have is complete."

Wilson's deposition testimony provided:

"Q.    Okay. When the original recordings are made, are the times that calls are made on the original tapes?

A.    Yes. If you're playing back from the system itself, yes you can see the time."

¶ 13    On July 14, 2014, after hearing argument from counsel, the trial court, Judge Thomas M. Schippers presiding, denied plaintiff's motion for leave to file a third amended complaint.

¶ 14    On July 14, 2014, the case proceeded to trial solely on the negligence counts in plaintiff's second amended complaint, regarding whether Perrin was in the execution and enforcement of the law at the time of the accident.

¶ 15    At trial Perrin testified as follows. Before the accident he was on patrol and heard a call over the radio that Grayer was requesting assistance with a vehicle taken without permission (VTWOP) that he had been following in Waukegan. Perrin initially did not proceed to assist Grayer, because officers "Lariquet," Johnny Parasain, and Carl Smith were heading there to assist Grayer. Perrin proceeded to assist Grayer when he heard on the radio that the car stopped at Able Pawnshop in Waukegan and the occupants fled on foot. Perrin did not believe that Grayer was in peril. Perrin was at the 1400 block of Sheridan Road approaching 10th Street when he turned his siren and emergency lights on. At 7:28 p.m. Perrin called into the police department and reported the accident at South and McAlister.

¶ 16    On cross-examination Perrin testified that at the time of the accident he was "en route to provide assistance for Officer Grayer." He was going to "help Officer Grayer." Perrin came to a two-second stop at the stop sign at McAlister and South. He was approximately 10 feet from the intersection when he stopped.

¶ 17    On redirect examination Perrin testified that he turned his wheel to the left before the impact. Perrin's squad car hit the rear tire on the passenger side of the car in which plaintiff was a passenger. Perrin testified that he was not sure where Able Pawnshop was located. Perrin testified that he activated his siren 10 feet before he entered the intersection. The accident occurred at approximately 7:26 p.m.

¶ 18    Grayer testified as follows. On the day of the accident, at around 4:27 p.m., Grayer responded to a call reporting a VTWOP, a Grand Am. The complainant told Grayer that the person who took the car was the complainant's ex-boyfriend, Ricky. Grayer reported the VTWOP to the City police department. Although the car was not "stolen," a VTWOP is treated the same way. "[W]hen you locate the vehicle that's either stolen and/or a vehicle taken without permission, when we do a traffic stop, you know, we get enough units in the area to conduct a traffic stop."

¶ 19    While Grayer was on patrol, he saw the VTWOP. He began following the vehicle near 14th and Grove Streets, and he radioed that he had located the vehicle in Waukegan at 7:23 p.m. Grayer provided the vehicle's license plate number and his location in Waukegan. There were three people in the vehicle. Grayer followed the vehicle for several blocks but did not have his lights or siren on, because he was waiting for backup units to stop it. Grayer was concerned because he did not know what the outcome would be, "even though the vehicle was taken without permission. I don't know what his mindset is. *** 14 years law enforcement, I've been in situations where, okay, you know, I hit the lights and the car just takes off." Grayer testified that he needed enough police units to stop the vehicle—five or six to cordon off the street.

¶ 20    Grayer further testified as follows. At one point the driver of the VTWOP began driving recklessly. He failed to stop at the stop sign at 10th and Elmwood Streets, and when he turned

right, he "overshot and went to the opposite lane *** hit the curb," and the "front tire went flat." The driver lost control of the vehicle, reversed it, and continued to drive in a reckless manner. Grayer was hoping that Waukegan police officers would arrive. Grayer continued to follow the vehicle "to observe his reckless act *** I'm a witness now for another agency." Grayer did not turn his lights and siren on at this point, because if he did the driver would "be even more dangerous." After a few more turns the vehicle traveled north on Washington Park. At that time, Grayer advised dispatch for the City police department that the speed of the vehicle was 30 miles per hour. At Washington Park and Dugdale Road, the driver of the vehicle failed to stop at the stop sign, continued north, and began speeding.

¶ 21 As the Grand Am was speeding north on Washington Park approaching the busy intersection with Belvidere Road, Grayer turned his lights and siren on to warn the drivers traveling on Belvidere to try to prevent an accident, because Grayer suspected that the vehicle would not stop at the stop sign. The eastbound and westbound Belvidere traffic stopped and let the vehicle speed through the intersection without incident. Once the driver crossed Belvidere Road, "[h]e ended up jumping into the parking lot of Able pawnshop." He exited the vehicle and ran, at which time Grayer exited his marked squad car and "gave a foot pursuit." Grayer chased the driver into an open field and said, "Ricky, stop. It ain't all that serious." Ricky looked at Grayer and then continued to run. Grayer eventually stopped chasing Ricky. A Waukegan officer observed Ricky jump into another car and drive off. Grayer had no idea how long it took from when he called for assistance until the vehicle stopped at Able Pawnshop.

¶ 22 During cross-examination Grayer testified that during roll call on the day of the accident the officers "learned that a female was trying to report her vehicle stolen, but a report was never taken." Grayer had informed dispatch that he was following VTWOP and he believed that other units on the shift were working their way to his location. Grayer stated that when he receives a

call of an officer needing assistance "to stop a vehicle, we are warranted to activate our lights and to get to that area as fast as possible."

¶ 23    City police sergeant Eric Martin testified as follows. Between 7:23 and 7:30 on the evening of the accident, Martin was in a patrol car in the City monitoring radio transmissions, when he heard Grayer request backup assistance. Martin testified, "When an officer requests additional units, the whole team comes." Martin was trying to get to the area so the "team" could "tactically take [the vehicle] down." Martin "was en route to [Grayer's] location" when Martin was notified of Perrin's accident.

¶ 24    During cross-examination Martin testified as follows. As the sergeant in the field at the time, Martin "allowed [City police officers] to go in Waukegan." Martin did not tell the officers to either go or not go to assist Grayer in Waukegan. Martin had no idea how long it took from when Grayer called for assistance until the VTWOP stopped at Able Pawnshop.

¶ 25    During redirect examination Martin testified as follows. When Martin heard on the radio that Perrin was involved in an accident, he proceeded to the scene immediately. The pursuit of the VTWOP ended up in a foot pursuit. Martin did not know what time the vehicle ended up at Able Pawnshop. He stated that he had "doubts" that the accident on McAlister occurred at 7:27 p.m. Martin further testified that, when an officer calls into dispatch, the dispatcher gives the call a time.

¶ 26    Wilson, deputy chief of police for the City, testified as follows. Wilson was shown an exhibit and testified that it was a call log that listed all the calls that were taken by dispatch during the shift, in time sequence. A call log contains more information than a CAD report. The exhibit was a true and accurate representation of a call log generated by the City police department, prepared in the ordinary course of business. At this point plaintiff's attorney renewed her motion *in limine* seeking to bar the call log, arguing that it was prepared in

anticipation of litigation. The trial court reminded plaintiff's attorney that her motion had been denied. Defendants' attorney moved to admit the call log into evidence, plaintiff objected, the trial court overruled the objection, and the call log was admitted. Plaintiff's counsel acknowledged that the date on the call log reflected the date on which the call log was printed.

¶ 27    Wilson further testified that the first page of the call log indicated that at 7:23 p.m. Grayer reported a VTWOP and that it listed all the officers who responded to Grayer's call for assistance, including Perrin.

¶ 28    On cross-examination Wilson testified that the same dispatcher enters all the calls in the CAD report. "CAD reports are a backup." "The calls are entered when [the dispatcher] can." On the evening of the accident, "there was one dispatcher working, and I think it would be impossible for him to enter in the information as it [was] taking place." Wilson testified that the times listed in a CAD report reflect when the dispatcher was able to enter information into the computer system and do not reflect exact times that events occurred, depending on how busy the dispatcher is.

¶ 29    During the jury instruction conference, the trial court accepted defendants' special interrogatory No. 1069 and refused defendants' special interrogatory No. 1070. The accepted special interrogatory read, "Do you find that James Perrin was en route to assist Officer Grayer at the time of the collision with Mary Lacey and Margo Willis?" The refused special interrogatory read, "Do you find that James Perrin was in the execution and enforcement of the law at the time of the collision with Mary Lacey and Margo Willis?"

¶ 30    The trial court instructed the jury that plaintiff claimed that Perrin was negligent for the reasons stated in her second amended complaint. Defendants claimed that they were immune from liability because Perrin was engaged in the execution and enforcement of the law at the

time of the collision. Plaintiff denied that Perrin was immune from liability, because Perrin was not engaged in the execution and enforcement of the law at the time of the collision.

¶ 31 The jury returned a general verdict in favor of plaintiff and against defendants and awarded damages in the amount of $125,016.50. When the jury returned its verdict, it was discovered that the refused special interrogatory had been given to the jury and that the jury had answered it in the affirmative. The trial court had read the accepted special interrogatory to the jury along with the instructions, but for some unknown reason it had not been submitted in written form to the jury. Upon learning that the jury had answered the refused special interrogatory, plaintiff moved for a mistrial. The trial court denied plaintiff's motion. The trial court then reread the accepted special interrogatory to the jury and instructed them to answer it. Subsequently, the jury answered the accepted special interrogatory in the affirmative.

¶ 32 On July 21, 2014, the trial court entered judgment in favor of defendants, stating in its written order the following:

"This matter coming to be heard for jury trial, and the jury hearing all the evidence:

The Court hereby finds as follows:

(1) The jury returned Verdict Form A, with damages assessed in the total amount of $125, 016.50 itemized on the Verdict Form A;

(2) The jury also returned two special interrogatory responses in the affirmative that Perrin was in the execution of law and en route to assist Grayer;

(3) The court finds that the general verdict is inconsistent with the special interrogatories, which control; the Court hereby enters judgment in favor of defendants, Perrin and North Chicago."

¶ 33    On August 19, 2014, plaintiff filed a posttrial motion for judgement notwithstanding the verdict, a new trial on the issue of liability only, or an entirely new trial.  On October 14, 2014, the trial court denied plaintiff's posttrial motion.  On November 12, 2015, plaintiff filed a notice of appeal.

¶ 34                                         II. ANALYSIS

¶ 35                                    A. Summary Judgment

¶ 36    Plaintiff argues that the trial court erred by granting defendants summary judgment on the issue of willful and wanton conduct.

¶ 37    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2014).  While a plaintiff need not prove its case at the summary judgment stage, the plaintiff must present enough evidence to create a genuine issue of fact.  *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).  Our review of an order granting summary judgment is *de novo.  American Service Insurance Co. v. Jones*, 401 Ill. App. 3d 514, 520 (2010).

¶ 38    Section 2-202 of the Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."  745 ILCS 10/2-202 (West 2014).  The Tort Immunity Act further provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."  745 ILCS 10/2-109 (West 2014).  The Tort Immunity Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210 (West 2014).

¶ 39    The question of whether a police officer's actions amount to willful and wanton conduct is normally reserved for the trier of fact. *Shuttlesworth v. City of Chicago*, 377 Ill. App. 3d 360, 366 (2007). However, the question may be resolved by the trial court on a motion for summary judgment where no genuine issue of material fact exists as to whether the police officer engaged in willful and wanton conduct. *Id.* A trial court may grant summary judgment only "when all the evidence viewed in the light most favorable to the nonmovant so overwhelmingly favors the movant that no contrary determination based on that evidence could ever stand." *Id.*

¶ 40    Plaintiff argues that summary judgment was improper because a genuine issue of material fact existed regarding whether Perrin engaged in willful and wanton conduct. Specifically, plaintiff argues that the following actions are evidence of willful and wanton conduct in that they show an utter indifference to or conscious disregard for the safety of others: failing to stop at the stop sign, proceeding through the intersection prior to clearing it, failing to see the vehicle plaintiff was in before he entered the intersection, accelerating into the intersection while looking down, and violating certain City police department rules and regulations.

¶ 41    Perrin stated in his deposition that on the day of the accident, at the beginning of his shift, a vehicle had been reported stolen and the police officers were told to "be on the lookout for it." Before the accident Perrin received a radio call from Grayer, who had been in pursuit of the vehicle and was requesting backup. Perrin went to assist Grayer, who was then in pursuit of the vehicle, which was now reported as a VTWOP. The vehicle was fleeing from Grayer. "The vehicle began to pick up speed on Officer Grayer," the occupants jumped out of the car, and Grayer radioed and gave his location. That is when Perrin "headed that way" to assist. Grayer was on foot in pursuit of one of the "suspects." Other officers were also responding to Grayer's request.

¶ 42    When Perrin received Grayer's request, he turned on his emergency lights and siren. Perrin turned onto South Avenue, and, as he approached McAllister, he stopped at the stop sign, coming to a stop 10 feet from the intersection, looked to his left and to his right, "cleared the intersection," proceeded into the intersection, and "made contact with" plaintiff's vehicle. Perrin testified, "In that split second I saw the vehicle, but by the time I couldn't make–I couldn't stop in that time. I could see the vehicle, but I had already committed to the intersection to proceed through the intersection prior to clearing it."

¶ 43    Perrin further testified that he was traveling 25 to 30 miles an hour. The posted speed limit was 30. The weather was clear and the streets were dry. It was dusk and the street lights had not yet come on. Perrin testified that he did not see the vehicle before the collision. Perrin also testified, "As I was going through the intersection, I saw her front passenger or the headlights. It was–I actually avoided the front part and hit her rear, so I had seen her front lights and avoided that." Perrin turned his vehicle to try to avoid the collision.

¶ 44    Plaintiff stated in her deposition that there was "very light traffic" at the time of the accident. Willis testified that, as she approached the intersection of McAllister and South Avenues, she saw Perrin's squad car parked on South. While Willis was in the middle of the intersection, she saw Perrin's squad car emergency lights come on, heard Perrin's siren, and saw Perrin begin to drive into the intersection. Willis testified, "I could see him looking down and moving and everything happened all at the same time as [Perrin] moved to us." While Perrin was looking down he was accelerating his squad car and he continued to accelerate up to the point of impact. Perrin's squad car struck the rear passenger side of Willis's vehicle.

¶ 45    There is nothing in the record to create a genuine issue of material fact as to whether Perrin's course of action showed an utter indifference to or conscious disregard for the safety of others or their property. See 745 ILCS 10/1-210 (West 2014). The undisputed evidence is that

the weather was clear, the traffic was light, and the roads were dry. Willis's testimony that Perrin was looking down as he drove and was accelerating does not rise to the level of showing willful and wanton conduct. See *Stamat v. Merry*, 78 Ill. App. 3d 445, 450 (1979) (holding that the defendant's inattentive action of turning down the car radio, causing the car to go out of control, was negligent rather than willful and wanton). Further, the fact that Perrin might have violated police rules and regulations does not rise to the level of willful and wanton conduct. "Violation of self-imposed rules or internal guidelines *** 'does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond that, willful and wanton conduct.' [Citation.] *** [A] police officer cannot be found to have acted willfully and wantonly when he pursues a vehicle driven recklessly as long as the officer does not pursue the vehicle in a reckless fashion." *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 781-82 (2006).

¶ 46    Plaintiff argues that Perrin did not stop at the stop sign. Plaintiff supports this assertion with Perrin's deposition testimony that when he came to a stop he was 10 feet away from the intersection. However, Perrin's testimony does not establish a genuine issue of material fact regarding whether his conduct was willful and wanton, because stop signs are located many feet before intersections.

¶ 47    Plaintiff also argues that Perrin committed to the intersection before he cleared it. Plaintiff contends that the following deposition testimony by Perrin supports this contention:

> "In that split second I saw the vehicle, but by the time I couldn't make–I couldn't stop in that time. I could see the vehicle, but I had already committed to the intersection to proceed through the intersection prior to clearing it."

However, before and after making this statement, Perrin testified numerous times that he cleared the intersection before he entered it. Taken in context, the ambiguous deposition testimony that plaintiff cites does not negate Perrin's other testimony that he proceeded through the intersection

only after he cleared it. Accordingly, the testimony does not create a genuine issue of material fact regarding whether Perrin's conduct was willful and wanton.

¶ 48    Plaintiff cites *Hudson v. City of Chicago*, 378 Ill. App. 3d 373 (2007), and *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248 (2003), to support her argument that evidence of Perrin's violation of the police department's rules and regulations creates a genuine issue of material fact regarding whether his conduct was willful and wanton. Most notably, plaintiff argues that the trial court should have considered that Perrin violated rule 10.12, which involves weighing the benefits versus the risks involved in a pursuit.

¶ 49    In *Hudson* the issue was whether the jury instruction on willful-and-wanton conduct was erroneous because it suggested that violations of police department rules and regulations were willful and wanton *per se*. *Hudson*, 378 Ill. App. 3d at 405. The appellate court held that such violations could not constitute willful and wanton conduct *per se* but that a jury may consider evidence of such violations as evidence of willful and wanton conduct. *Id*.

¶ 50    In *Suwanski*, this court determined that summary judgment regarding whether a police officer's conduct was willful and wanton was improper, but we did not base our decision on evidence of the police officer's violation of police department rules and regulations. This court reasoned that the degree to which the defendant police officer complied with "pursuit policy" could be interpreted both ways: supportive of a finding of willful and wanton conduct and supportive of a finding of no willful and wanton conduct. *Suwanski*, 342 Ill. App. 3d at 257. Further, there was evidence that the police officer violated the police policy requiring officers to weigh the benefits versus the risks involved in a pursuit. *Id.* at 253-54. In this case, plaintiff cites no evidence whatsoever that Perrin failed to weigh the benefits versus the risks involved in the pursuit. Further, in *Suwanski*, the pursuit lasted over 8½ minutes and covered over 6½ miles, and the pursued vehicle ran stop signs and red lights, reaching speeds of 70 to 100 miles per

hour. *Id.* at 250-52. In this case, the pursuit ended almost immediately, covered less than a block, and reached speeds of only 30 miles per hour. Thus, this case presents a situation that seems "to clearly be, as a matter of law, below the theoretical minimum for willful and wanton conduct." *Id*. at 257. Accordingly, the trial court properly granted summary judgment in defendants' favor on this issue.

¶ 51 Plaintiff also argues that in granting summary judgment the trial court erred by ruling that the pursuit of a fleeing and eluding suspect is the execution and enforcement of the law and that the sole issue in the case was whether Perrin was responding to an emergency call. Plaintiff contends that this was improper because the only evidence that a vehicle was fleeing or eluding came from Perrin's deposition testimony of what he learned from radio dispatches, which were inadmissible hearsay.

¶ 52 Evidence, such as hearsay, that is inadmissible at trial, may not be considered in support of or in opposition to a summary judgment motion. *People ex rel. Madigan v. Kole*, 2012 IL App (2d) 110245, ¶ 47. Hearsay is a statement, other than one made by the declarant while testifying at trial or in a hearing, offered in evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Testimony regarding an out-of-court statement that is offered to prove something other than the truth of the matter asserted is, by definition, not hearsay. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); *People v. Banks*, 237 Ill. 2d 154, 180 (2010). For example, testimony about an out-of-court statement offered for the effect the statement had on the listener or for how the listener subsequently acted in reaction to the statement is not hearsay and is admissible. *People v. Sorrels*, 389 Ill. App. 3d 547, 553 (2009). In this case, the radio dispatches that Perrin testified about explained why he proceeded through the intersection. The statements had the nonhearsay purpose of establishing their effect on the listener, rather than

establishing the truth of the matter asserted. See *People v. Burney*, 2011 IL App (4th) 100343, ¶ 81. Accordingly, they were properly considered by the trial court on summary judgment.

¶ 53                                B. Special Interrogatories

¶ 54     Next, plaintiff argues that the answers to the special interrogatories should be set aside and that she is entitled to the entry of a judgment on the general verdict (judgment notwithstanding the verdict), or, in the alternative, that she is entitled to a new trial on the issue of liability or an entirely new trial, because the special interrogatories were improperly submitted and the answers are against the manifest weight of the evidence, lacking any substantial evidentiary support.

¶ 55     The purpose of a special interrogatory is not to instruct the jury, but to serve as a check on the jury's deliberation and to enable the jury to determine one or more specific issues of ultimate fact. *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). A special interrogatory is in the proper form if "(1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Id*. A special interrogatory's response is inconsistent with a general verdict only where it is "clearly and absolutely irreconcilable with the general verdict." (Internal quotation marks omitted.) *Id*. at 555-56. A special interrogatory: (1) should consist of a single direct question; (2) should not be prejudicial, repetitive, misleading, confusing, or ambiguous; and (3) should use the same language or terms as the tendered instructions. *Id*. at 563. Section 2-1108 of the Illinois Code of Civil Procedure governs special interrogatories and provides that "[w]hen the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2014).

¶ 56     A judgment notwithstanding the verdict should be granted only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors

[a] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). The standard for entry of judgment notwithstanding the verdict is a "high one"; thus, it is not proper if "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." (Internal quotation marks omitted.) *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). We review *de novo* the trial court's decision on a motion for judgment notwithstanding the verdict. *McClure v. Owen Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999). As to a motion for a new trial, we review for an abuse of discretion. *Andrade v. General Motors Corp.*, 336 Ill. App. 3d 827, 831 (2003).

¶ 57                    1. Execution and Enforcement of the Law

¶ 58    More specifically, plaintiff argues that the special interrogatory regarding execution and enforcement of the law, No. 1070, was improper because the term "execution and enforcement" had been used repetitively throughout the instructions. Plaintiff fails to recognize that it is proper for a special interrogatory to use the same language or terms as the tendered instructions. See *Simmons*, 198 Ill. 2d at 563; see also *Niewold v. Fry*, 306 Ill. App. 3d 735, 747 (1999) (holding that a special interrogatory using the term "ordinary care" was properly given, because the instructions defined ordinary care in terms of what a "reasonably careful person" would do).

¶ 59    Plaintiff also argues that special interrogatory No. 1070 was confusing and misleading because the jury might have been confused by the term "VTWOP," which does not signify a crime. We disagree with plaintiff, because the special interrogatory did not use the term "VTWOP."

¶ 60    Next, plaintiff argues that special interrogatory No. 1070 was improper because there was no evidence that Perrin was responding to an emergency and there was no indication that any crime had been committed. Further, plaintiff argues that there is no substantial evidentiary

support for the jury's answer to the special interrogatory and that therefore the trial court should have set aside the jury's answer and entered judgment on the general verdict in plaintiff's favor.

¶ 61    However, a police officer does not have to be engaged in an emergency response to be in the execution and enforcement of the law pursuant to section 2-202 of the Tort Immunity Act.  In *Bruecks v. County of Lake*, 276 Ill. App. 3d 567 (1995), the plaintiff brought negligence claims against Lake County and a deputy sheriff alleging that, while the plaintiff was walking across a road, he was struck and injured by the deputy's police car.  *Id*. at 568.  The defendants claimed immunity under sections 2-202 and 2-109 of the Tort Immunity Act, alleging that when the accident occurred the deputy was responding to a report of shots fired.  *Id*.  The trial court granted the defendants' motion for summary judgment and the plaintiff appealed.  *Id*.  We affirmed, reasoning:

> "[The deputy] was responding to a call of shots fired.  He clearly was being called upon to execute or enforce a law.  The facts that he was not specifically dispatched to the scene, did not have his emergency lights and siren activated, and did not subjectively consider the situation to be an emergency do not alter this conclusion.  The cases in which immunity has been found applicable do not require that the officer be engaged in an emergency response." *Id*. at 569.

¶ 62    Further, a police officer does not have to be engaged in preventing a crime to be in the execution and enforcement of the law pursuant to section 2-202 of the Tort Immunity Act.  In *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211 (1986), our supreme court held that investigating a traffic accident constituted an execution or enforcement of the law.  *Id*. at 221.  Because there is no requirement that an officer is responding to an emergency or that a crime is being committed to be in the execution and enforcement of the law, plaintiff's argument fails.  Although the trial court initially withheld this special interrogatory, its submission to the jury was proper.  It related

to an ultimate issue of fact upon which the rights of the parties depended, the answer was inconsistent with the general verdict, it consisted of a single direct question, and it was not prejudicial, repetitive, misleading, confusing, or ambiguous. See *Simmons*, 198 Ill. 2d at 555-56, 563.

¶ 63   Plaintiff next contends that the jury's affirmative response to special interrogatory No. 1070 is contrary to the manifest weight of the evidence, lacking evidentiary support. Plaintiff asserts that no crime was involved, no law was violated, Grayer did not activate his emergency lights or siren, no emergency existed, and a report of a VTWOP is not serious and does not require officers to pursue. To establish that the jury's verdict is against the manifest weight of the evidence, the plaintiff must show that the opposite conclusion is clearly evident or that the findings of the jury are unreasonable, arbitrary, and not based on any evidence. *Id.* at 561.

¶ 64   Here, the evidence amply supports the jury's answer to the special interrogatory. Perrin testified that at the time of the accident he was responding to a call for assistance from Grayer. Grayer testified that he was following a VTWOP and waiting for backup to arrive to cordon off the vehicle. Grayer did not activate his lights, because he was concerned that the vehicle would "take off." Grayer followed the vehicle as the driver drove recklessly, failing to stop at stop signs, speeding, and driving with a flat tire. There was a call for assistance into the Waukegan police department and Grayer was following the vehicle until Waukegan police officers arrived. There was evidence that Grayer called the City police department for assistance at 7:23 p.m. and that Perrin reported that the accident occurred at 7:28 p.m. In light of this evidence, we cannot say that the jury's affirmative answer that Perrin was in the execution and enforcement of the law at the time of the accident is against the manifest weight of the evidence.

¶ 65   Plaintiff cites *Hudson*, 378 Ill. App. 3d 373, to support her argument. In *Hudson*, a police officer's squad car struck the plaintiff's vehicle on an expressway during a high-speed pursuit of

a suspect. The officer testified that she heard about a pursuit of a suspect over her radio and entered the expressway to " 'assist,' " and not to participate in the pursuit itself. *Id*. at 379-80. The officer testified that " 'assistance' " could include something " 'as little as traffic control' " or providing assistance if the suspect fled on foot or took a hostage. *Id*. at 380. Following a jury verdict in the plaintiff's favor, the defendants, the officer and the City of Chicago, appealed, arguing that they were entitled to a judgment notwithstanding the verdict on the ground that they were immune based on sections 2-109 and 2-202 of the Tort Immunity Act, because the officer was in the execution and enforcement of the law at the time of the collision. *Id*. at 387. The appellate court affirmed the judgment in favor of the plaintiff, reasoning that section 2-202 would apply if at the time of the accident the pursuing officers had requested backup, the defendant officer had been assigned to the pursuit itself, the officer had been providing traffic control, or the officer had been on her way to provide traffic control. *Id*. at 391-92. The court held that under the evidence presented, however, the jury was free to conclude that none of those scenarios had occurred. *Id*. at 392-93.

¶ 66 In this case, unlike in *Hudson*, there was evidence that Perrin received a radio call requesting assistance from Grayer. There was also evidence that Perrin was en route to assist Grayer when the accident occurred. Thus, the jury was free to conclude that Perrin was in the execution and enforcement of the law at the time of the accident. Accordingly, *Hudson* is distinguishable from this case.

¶ 67                           2. En Route To Assist Grayer

¶ 68 Next, plaintiff argues that the submission, after the jury rendered its verdict, of special interrogatory No. 1069 regarding whether Perrin was en route to assist Grayer was improper, and that the jury's affirmative answer is contrary to the manifest weight of the evidence, lacking any substantial support.

¶ 69    Special interrogatory No. 1069 read: "Do you find that James Perrin was en route to assist Officer Grayer at the time of the collision with Mary Lacey and Margo Willis?"  Although the trial court read this special interrogatory to the jury before the verdict, the form was not included in the jury instruction packet.

¶ 70    Plaintiff argues that the trial court erred by giving the jury this special interrogatory form after the jury had returned the general verdict in favor of plaintiff and answered special interrogatory No. 1070 in the affirmative, because there was no competent evidence that Perrin was en route to assist Grayer at the time of the collision.  Plaintiff notes that, although Perrin testified that he did not decide to proceed to assist Grayer until Grayer arrived at Able Pawnshop, the CAD report shows that the accident occurred at 7:27 p.m. and Grayer arrived at Able Pawnshop at 8:13 p.m.  Plaintiff contends that the CAD report proves that Perrin was not en route to assist Grayer at the time of the collision.  However, plaintiff ignores Wilson's testimony that the dispatcher enters calls on the report when the dispatcher has time to do so.  Thus, a reasonable jury could have concluded that the times on the CAD report were not accurate.

¶ 71    Plaintiff also contends that special interrogatory No. 1069 was improper because the affirmative answer was not dispositive of the case, since Grayer was not executing or enforcing any law and therefore Perrin's alleged assistance to Grayer would not have been in the execution or enforcement of any law.  We have already determined that the jury's affirmative answer to special interrogatory No. 1070 is not against the manifest weight of the evidence.  Therefore, we need not revisit the issue here.

¶ 72    Next, plaintiff argues that testimony of City police officers in violation of the trial court's order granting plaintiff's motion *in limine* failed to constitute competent evidence that Perrin was en route to assist Grayer.  The trial court granted plaintiff's motion *in limine* "to prohibit the testimony of other police officers that Defendant Perrin was on an emergency call, or on his way

to assist Officer Grayer because any such testimony would be based on inadmissible hearsay, not upon personal knowledge." Plaintiff lists four alleged "willful violations of the motion *in limine*": (1) Grayer's "non-responsive" answer when asked by plaintiff's counsel how many officers Grayer needed to assist him, namely, "We all show up. I don't know–on our–I'm sorry, I can't answer that"; (2) Wilson's testimony that all the officers listed on the call log were responding to the same call; (3) in response to plaintiff's counsel's question regarding how many officers are needed to stop a VTWOP, Martin answered, "the whole team comes"; and (4) in response to plaintiff's counsel's questions regarding whether the VTWOP situation turned into something else and what that was, Martin replied, "It turned into something else. *** A secondary accident."

¶ 73 Under the facts of this case, plaintiff has failed to properly preserve these issues on appeal. Regarding the first alleged error, plaintiff invited the alleged error by eliciting Grayer's response and thus has forfeited the issue. See *People v. Woods*, 214 Ill. 2d 455, 475 (2005). Regarding the remaining three alleged errors, because plaintiff failed to object to and move to strike Martin's and Wilson's testimony at issue, plaintiff has forfeited these issues. See *Hardy v. Cordero*, 399 Ill. App. 3d 1126, 1135 (2010).

¶ 74 C. Leave To File Third Amended Complaint

¶ 75 Plaintiff argues that the trial court erred by denying her motion to file a third amended complaint to add a spoliation-of-evidence count against the City.

¶ 76 "Illinois law supports a liberal policy of allowing amendments to the pleadings so as to enable parties to fully present their alleged cause or causes of action." *Grove v. Carle Foundation Hospital*, 364 Ill. App. 3d 412, 417 (2006). However, a party does not have an absolute right to amend a complaint. *Id.* A trial court's ruling on a motion to amend is a matter of discretion and will not be reversed on review absent an abuse of that discretion. *Clemons v.*

*Mechanical Devices Co.*, 202 Ill. 2d 344, 351 (2002). "A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). While the right to amend is "neither absolute nor unlimited" (*I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 219 (2010)), the denial of leave to amend is an abuse of discretion if allowing the amendment would further the ends of justice (*W.E. Erickson Construction, Inc. v. Chicago Title Insurance Co.*, 266 Ill. App. 3d 905, 911 (1994)). To determine whether an amendment would further the ends of justice, courts must consider the following four factors:

> "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 77 As to the first factor, whether the proposed amendment would cure defects in the complaint, plaintiff argues that "adding a spoliation of evidence count for [the City's] destruction of the original time-stamped copies of the dispatch recordings would cure a defective pleading because the Second Amended Complaint at law did not contain this count against the City of North Chicago." However, as this argument concedes, plaintiff proposed not to cure any defect in any previously pleaded cause of action, but rather to add a *new* cause of action. See *Jones v. O'Brien Tire & Battery Service Center, Inc.*, 374 Ill. App. 3d 918, 927 (2007) (distinguishing between adding a cause of action and curing a defective pleading). Therefore, plaintiff failed to meet this factor. See *Mason v. American National Fire Insurance Co.*, 295 Ill. App. 3d 199, 203 (1998).

¶ 78    The second factor, whether the opposing party would be prejudiced or surprised by the proposed amendment, is the most important factor. *Hartzog v. Martinez*, 372 Ill. App. 3d 515, 525 (2007). "Prejudice may be shown where delay before seeking an amendment leaves a party unprepared to respond to a new theory at trial." *Miller v. Pinnacle Door Co.*, 301 Ill. App. 3d 257, 261 (1998). Plaintiff complained to the City on or about November 6, 2013, that the CD copy of the dispatch tapes contained no time stamp, and the City informed plaintiff on January 7, 2014, that it was "unable to produce the original [dispatch] tape" and that "the copy of the audio that [plaintiff had] is complete." However, prior to plaintiff's proposed July 9, 2014, amendment, there was no indication that the City would be required to defend against a spoliation claim regarding the dispatch tapes and, therefore, the City had little if any notice to prepare for the defense of the claim. Moreover, plaintiff did not attempt to amend her complaint concurrently with her May 27, 2014, response to defendants' motion for summary judgment. Thus, the proposed amendment, brought after summary judgment and on the eve of trial, would have unfairly prejudiced the City and taken the City by complete surprise.

¶ 79    As to the third factor, whether the proposed amendment was timely, plaintiff filed her original complaint on March 7, 2012, two years and four months before she filed her motion to file her third amended complaint. Further, plaintiff learned on January 7, 2014, that the original dispatch recordings had been destroyed, but plaintiff did not seek leave to add a spoliation count until July 9, 2014, five days before trial commenced. Given the eleventh-hour filing of plaintiff's motion to file an amended complaint, plaintiff failed to meet this third factor.

¶ 80    Regarding the fourth factor, plaintiff had previous opportunities to amend her pleading to add a spoliation count. According to plaintiff's motion, she knew on December 27, 2013, that the CD she received from the City did not indicate the times that calls were placed and appeared to be edited. Plaintiff learned by letter on January 7, 2014, that the City was "unable to produce

the original [dispatch] tape" because it had been erased, there would be no time stamps, and the CD that plaintiff had received was "complete." Yet, the following day, January 8, plaintiff filed her second amended complaint absent a spoliation count. Plaintiff contends that she did not try to amend her complaint to add a spoliation count until July 9, 2014, because she was awaiting the outcome of defendants' motion for summary judgment. However, defendants filed their motion for summary judgment on March 27, 2014, more than two months after plaintiff learned about the destruction of the original tapes. Further, plaintiff failed to file an amended complaint when she filed her response to defendants' motion for summary judgment on May 27, 2014. Plaintiff also argues that she waited because the City "misled counsel as late as January 7, 2014 to believe that the original tapes were still in existence." However, plaintiff's argument is belied by her own allegations. Plaintiff alleged in her motion to amend that "[o]n January 7, 2014, [plaintiff's counsel was] advised that [the City] was unable to produce the original 911 tapes because they were destroyed." Therefore, plaintiff waited six months after she knew that the original dispatch tapes had been destroyed to file her motion to amend. Given the numerous opportunities plaintiff had to amend her complaint prior to July 9, 2014, plaintiff has failed to meet this fourth factor.

¶ 81 Because plaintiff has failed to meet any of the *Loyola* factors, we conclude that the trial court did not abuse its discretion by denying plaintiff's motion for leave to file a third amended complaint.

¶ 82                                     D. Admission of Police Call Log

¶ 83 Plaintiff also argues that the trial court abused its discretion by allowing defendants to introduce evidence of the call log, resulting in an unfair trial. Plaintiff argues that the call log dated November 12, 2013, was improperly admitted into evidence as a business record, because it was prepared in anticipation of litigation. The record establishes that the call log was made in

the ordinary course of business. Further, as plaintiff conceded during trial, the date on the call log, November 12, 2013, was the printout date, and not the date that the information was input. Therefore, the trial court did not abuse its discretion by admitting the call log.

¶ 84                                    III. CONCLUSION

¶ 85    For the reasons stated, we affirm the trial court's judgment.

¶ 86    Affirmed.